**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION**

| | |
|---|---|
| **ROBERT L. ARNOLD, individually and on behalf of all similarly situated individuals,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**BAYVIEW LOAN SERVICING, LLP[1] and U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, IN TRUST FOR THE BENEFIT OF THE HOLDERS OF BAYVIEW OPPORTUNITY MASTER FUND IIIa REMIC TRUST 2013-14NPL 1 BENEFICIAL INTEREST CERTIFICATES, SERIES 2013-14NPL 1,**<br><br>    **Defendants.** | **Case No. 1:14-cv-00543** |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Defendants Bayview Loan Servicing, LLC ("Bayview") and U.S. Bank National Association, as trustee, in trust for the benefit of the holders of Bayview Opportunity Master Fund IIIa REMIC Trust 2013-14NPL 1 Beneficial Interest Certificates, Series 2013-14NPL 1 ("U.S. Bank") (collectively, "Defendants"), by counsel, pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 7, submit this Memorandum in Support of their Motion for Summary Judgment on the Class Action Complaint ("Complaint") filed by Plaintiff Robert L. Arnold ("Plaintiff"). Because the undisputed evidence illustrates the absence of any genuine issues of material fact requiring a trial on this matter, Plaintiff's Complaint should be dismissed with prejudice.

---

[1] Defendants are informed that Plaintiff intends to file a Motion for Leave to File an Amended Complaint, correcting the name of defendant Bayview Loan Servicing, LLC.

## INTRODUCTION

Plaintiff Robert L. Arnold ("Plaintiff") alleges that Defendants violated the Fair Debt Collection Practices Act ("FDCPA") by mailing him two monthly statements in December 2013, after his loan was discharged in bankruptcy in 2012 and after his property was sold at foreclosure on November 25, 2013. Specifically, Plaintiff alleges that, although he had never received any monthly statements in the previous ten months that his mortgage loan was being handled by Bayview, the December 2013 statements constituted "Harassment in violation of 15 U.S.C. § 1692d," "False and Misleading representations in violation of 15 U.S.C. § 1692e," and "Unfair Practices in violation of 15 U.S.C. § 1692f(1)." Compl. ¶ 46, ECF No. 1.

Plaintiff's claims against U.S. Bank, as trustee of Bayview Opportunity Master Fund IIIa REMIC Trust 2013-14NPL 1 Beneficial Interest Certificates, Series 2013-14NPL 1 (the "Trust"), must be dismissed as a matter of law because:

- Neither U.S. Bank nor the Trust is a debt collector for purposes of the FDCPA; and

- Neither U.S. Bank nor the Trust engaged in any debt collection with respect to Plaintiff's Loan.

Plaintiff's claims against Bayview must be dismissed pursuant to the *bona fide* error defense included in the FDCPA because the December 2013 statements were sent to Plaintiff *only* because of an inadvertent coding error in Bayview's servicing system with respect to Plaintiff's Loan. Thus, Bayview is entitled to judgment as a matter of law because the undisputed facts prove Bayview's *bona fide* error defense by a preponderance of the evidence and Plaintiff cannot produce any evidence to rebut the following elements for Bayview's *bona fide* error defense:

- any FDCPA violation by Bayview was unintentional;

- the coding error was a sincere, good faith error; and

- the error occurred despite Bayview's policies and procedures, which are reasonably adapted to avoid such errors.

### STATEMENT OF UNDISPUTED FACTS

### PLAINTIFF'S REFINANCE LOAN OF THE PROPERTY

1.      In 2001, Plaintiff purchased the property located at 3714 Pineview Place, Gulf Shores, Alabama 36542 (the "Property").  Pl. Dep. Tr. at 16:16-17, 17:2-4.[2]

2.      In September of 2005, Plaintiff refinanced the Property with a $245,000 mortgage loan (the "Loan") obtained from Fairway Independent Mortgage Corporation.  *Id.* at 17:15-17; Compl. ¶¶ 14-16, ECF No. 1.

3.      CitiMortgage, Inc. ("CitiMortgage") was the servicer of the Loan until on or around February 1, 2013.  *Id.* ¶ 16.

### PLAINTIFF'S FINANCIAL DIFFICULTIES AND CHAPTER 7 BANKRUPTCY

4.      In 2011, Plaintiff experienced financial difficulties resulting from "a financial advisor who had not [Plaintiff's] best interest at heart," the crash of the "stock market" and the "housing market," and "[Hurricane] Ivan."  Pl. Dep. Tr. at 25:9-14, Exh. A.

5.      After Plaintiff fell behind on his payments toward the Loan, "Citi[Mortgage] called and said: "We're foreclosing."  *Id.* at 37:7-8.

6.       In order to "buy time" and "put the foreclosure off for a little while," Plaintiff "retain[ed] a bankruptcy attorney" and filed for Chapter 7 bankruptcy.  *Id.* at 37:10-17; *see also* Compl. ¶ 17, ECF No. 1.

---

[2] All relevant portions of Plaintiff's deposition have been attached hereto as **Exhibit A**.

7.      In his Statement of Intention filed with his bankruptcy petition, Plaintiff declared "under penalty of perjury" that he intended to retain the Property and reaffirm the Loan as a debt. Pl. Dep. Tr. at 152:4-21, Exh. A; *see also* Chapter 7 Individual Debtor's Statement of Intention, a copy of which is attached hereto as **Exhibit B**.

8.      Plaintiff received a bankruptcy discharge on September 21, 2012.  Compl. ¶ 17, ECF No. 1.

### TRANSFER OF PLAINTIFF'S LOAN TO DEFENDANTS

9.      On or around February 1, 2013, servicing rights to the Loan were transferred from CitiMortgage to Bayview.  *Id.* ¶ 21.

10.      Plaintiff's Loan "was in default" on February 1, 2013, when Bayview acquired the servicing rights to the Loan.  Def.'s Response to Request for Admission No. 5, a copy of which is attached hereto as **Exhibit C**.

11.      Plaintiff's Loan "was transferred to the Trust on or about July 25, 2013."  Answer ¶ 23, ECF No. 10; *see also* Sept. 27, 2013 Change of Creditor Notification, a copy of which is attached hereto as **Exhibit D**.

12.      The Trust is the "investor on the loan" and "the owner of the loan."  Rushia Dep. Tr. at 20:16-17.[3]

13.      "Since July 25, 2013," U.S. Bank "has acted as trustee for the Trust."  Rushia Decl. ¶ 4, a copy of which is attached hereto as **Exhibit F**.

14.      "U.S. Bank does not engage in debt collection or servicing of any loans contained in the Trust."  *Id.* ¶ 5.

---

[3] All relevant portions of the deposition of Bayview's corporate representative, Clark Rushia, have been attached hereto as **Exhibit E**.

15.     "The Trust does not engage in debt collection or servicing of any loans contained in the Trust."  *Id.* ¶ 6.

16.     "Bayview has been the only servicer of Plaintiff's Loan since it was transferred to Bayview from the prior servicer on or around February 1, 2013."  *Id.* ¶ 7.

### BAYVIEW'S SERVICING SOFTWARE AND MAN CODES

17.     Bayview's "primary [computerized] servicing system . . . is called Black Knight Financial Services, BKFS," and the "servicing component" of BKFS is called "Mortgage Servicing Package" ("MSP").  Rushia Dep. Tr. at 26:5-9, Exh. E.

18.     MSP contains fields, or codes, that can "be populated by either a user, or a process," *id*. at 27:2-3.  "Some codes are system driven, the user has no . . . ability to change the original intent of that code.  Other codes are user defined," where the "user has full control over what those codes are, and how they are used."  *Id*. at 27:5-8.

19.     One of the fields in MSP is called a "man code" or "person code," *id*. at 46:11-2, which is "used to indicate that a specific department is handling a [loan] file," Bayview Man Code Procedure, a copy of which is attached hereto as **Exhibit G**.

20.     "A man code of 'A' indicates that a loan is being handled by the Asset Management department and allows the issuance of monthly statements."  Rushia Decl. ¶ 14, Exh. F.

21.     "A man code of 'F' indicates that a loan is being handled by the Foreclosure Department and suppresses the issuance of monthly statements."  *Id.* ¶ 15.

22.     "A man code of 'R' indicates that a loan is being handled by the Real Estate Owned department and suppresses the issuance of monthly statements."  *Id.* ¶ 16.

23.     The "man code" in MSP can be changed "manually, by someone who actually just goes into the system, and goes to that field, and changes the code," Rushia Dep. Tr. at 47:25 through 48:4, Exh. E, or as "part of a process where . . . if [a user] do[es] or activate[s] something in one system, it will automatically change codes in another," *id.* at 48:5-8.

24.     "If a loan is [transferred to Bayview while the customer] is in an active bankruptcy," Bayview activates "a bankruptcy work station" in MSP, and the man code "puts the loan into an entirely different area of servicing.  It's under the jurisdiction of the bankruptcy department."  *Id.* at 33:9-20.

25.     If a customer is not in "active bankruptcy" when the loan is transferred, the customer's loan is not handled by the bankruptcy department.  *See id.* at 33:21-23.

26.     When Bayview "received [Plaintiff's] loan from the prior servicer," *id.* at 46:7-8, the man code on the Loan was not coded as an active bankruptcy because "[i]t was not an active bankruptcy," *id.* at 33:21-25, but was instead "coded as a foreclosure, which prevents statements from going out," *id.* at 46:8; *see also* Rushia Decl. ¶ 15, Exh. F.

27.     Neither the Trust nor Bayview were "performing debt collection on [Plaintiff's] loan" because "it was a foreclosure.  Debt collection at that point ceases."  Rushia Dep. Tr. at 60:11-15; see *also id.* at 130:18-21 (testifying that Bayview was not "attempting to collect a debt once it took over the servic[ing of Plaintiff's Loan]").

28.     Plaintiff did not receive any monthly statements from Bayview between February 1, 2013, when Bayview began servicing the Loan, and November 25, 2013, *id.* at 46:23-24, when the foreclosure sale of the Property occurred, Compl. ¶ 25, ECF No. 1.[4]

---

[4] Bayview does not "send [monthly] statements itself," but uses a "vendor" called "National Computer Print," located in "Jacksonville, Florida," which "produces these statements on behalf of Bayview."  Rushia Dep. Tr. at 42:1-12, Exh. E.

### THE INADVERTENT MAN CODE CHANGE ON PLAINTIFF'S LOAN

29.     Prior to the foreclosure sale of the Property on November 25, 2013, Farrah Peterson, a former employee of Bayview in the "quality assurance" department, "was performing a pre-foreclosure review of [Plaintiff's] loan" in the "RAM" system, "which is an acronym for real estate asset management."  Rushia Dep. Tr. at 49:1-10, Exh. E.

30.     "As part of her procedures," Ms. Peterson went "through a checklist . . . to make sure that all the regulatory components and all of the policies and procedures were followed in the foreclosure process, and in the regulatory process, which would enable [the] foreclosure sale to proceed."  *Id*. at 49:10-15.

31.     The checklist completed by Ms. Peterson, entitled "Operations Quality Control Analyst Loan Audit – Pre Foreclosure Sale," contains five sections to be completed by Bayview's quality assurance department prior to the foreclosure sale of a property.  *See* Operations Quality Control Analyst Loan Audit – Pre Foreclosure Sale Checklist, a copy of which is attached hereto as **Exhibit H**.

32.     Ms. Peterson answered the questions listed on the checklist and added notes to clarify her answers where necessary.  *Id*.

33.     In the checklist section entitled "FCL Bid," Ms. Peterson answered "No" to the question, "Are all necessary foreclosure audit documents complete and uploaded?"  *Id*.

34.     In the comments area of the FCL Bid section of the checklist, Ms. Peterson wrote: "Will email AM and CC'd AM manager to upload Hamp Cert. . . ."  *Id*.

35.     As "part of her review," Ms. Peterson "sent some e-mails to the asset management [department] to get some required certifications," and in doing so, "her error was

[that] she reactivated the loan in RAM, which was not part of her standard operating procedure." Rushia Dep. Tr. at 49:16-20, Exh. E.

36.     Specifically, "[o]n November 6, 2013, during her pre-foreclosure review of Plaintiff's loan file, [Ms.] Peterson inadvertently changed the man code on Plaintiff's loan file to an 'A' in error, mistakenly indicating that Plaintiff's loan was being reassigned to the Asset Management department and inadvertently causing monthly statements to be generated and issued to Plaintiff on December 2, 2013 and December 16, 2013."  Rushia Decl. ¶ 14, Exh. F; *see also* Rushia Dep. Tr. at 48:9-18, Exh. E; Def.'s Response to Pl.'s Interrog. No. 6, a copy of which is attached hereto as **Exhibit I**.[5]

37.     "The Asset Management department is tasked with mitigating losses due to non-performing assets.  Asset managers will review loans in their portfolio to determine which loss mitigation workout options are best suited for the customer."  Bayview Asset Management Function Procedure, a copy of which is attached hereto as **Exhibit J**.

38.     "[T]he man code should not have been changed on [Plaintiff's] Loan from an F to an A because [the Loan] was clearly headed for a foreclosure sale."  Rushia Dep. Tr. at 53:14-17, Exh. E.

39.     Nowhere in the Operations Quality Control Analyst Loan Audit – Pre Foreclosure Sale checklist are any instructions to reactivate a loan prior to a foreclosure sale.  *See* Exh. H.

40.     "Plaintiff's loan file was the only file affected by Ms. Peterson's inadvertent November 6, 2013 change of the man code in Plaintiff's loan file."  Rushia Decl. ¶ 15, Exh. F;

---

[5] The Operations Quality Control Analyst Loan Audit – Pre Foreclosure Sale checklist produced to Plaintiff during discovery contains a "Submission Date" of "May 27, 2015."  Exh. H.  However, "[t]he Consolidated Notes Log for Plaintiff's Loan reflects that a pre-foreclosure review of Plaintiff's loan file was conducted by former Bayview employee Farrah Peterson on November 6, 2013."  Rushia Decl. ¶ 18 (citing Consolidated Notes Log at 5-6, Exh. 1 to Rushia Decl.).

*see also* Rushia Dep. Tr. at 51:12-20, Exh. E; *id*. at Errata Sheet (clarifying that it was "systematically impossible" that the Ms. Peterson's reactivation of Plaintiff's Loan "could have changed anyone else's loan").

### THE DECEMBER 2, 2013 AND DECEMBER 16, 2013 STATEMENTS

41.     On December 2, 2013, seven days after the November 25, 2013 foreclosure sale of the Property, a monthly statement was sent to Plaintiff for the first time since Bayview had acquired the servicing rights to Plaintiff's Loan, because "the man code indicating a foreclosure was inadvertently removed, which allowed the statement process to actually issue a statement." *Id*. at 46:23-24, 47:3-5.

42.     On or around December 2, 2013, Plaintiff "opened the letter," "said a few expletives, and then . . . showed [the statement] to [his wife]," who "called customer service" at Bayview on or around December 9, 2013.  Pl. Dep. Tr. at 96:2-9, 91:5-22, Exh. A.[6]

43.     The December 2, 2013 statement contained the following disclosure: "To the extent that your obligation has been discharged or is subject to an automatic-stay bankruptcy, this letter is for compliance and informational purposes only, and does not constitute a demand for payment or any attempt to collect such obligation."  *Id*. at 95:14-20.

44.     On December 16, 2013, seven days after Plaintiff's wife called Bayview's customer service department, another statement was sent to Plaintiff, which contained the "same paragraph with the bankruptcy disclosure and informational purposes only" statement.  *Id*. at 100:16-23.

---

[6] Because Plaintiff "was working full-time at the time," his wife "always handled the business end."  Pl. Dep. Tr. at 96:13-15, Exh. A.

## CORRECTION OF THE INCORRECT MAN CODE ON PLAINTIFF'S LOAN

45.     After the November 25, 2013 foreclosure sale of the Property, when Bayview discovered that Plaintiff's Loan had been inadvertently coded "from an F to an A," Rushia Dep. Tr. at 53:14-17, Exh. E, the man code on Plaintiff's Loan "was changed to 'R' . . ., which again suppressed all statements to Plaintiff," Def.'s Response to Interrog. No. 6, Exh. I; *see also* Rushia Decl. ¶ 16 ("A man code of 'R' indicates that a loan is being handled by the Real Estate Owned department and suppresses the issuance of monthly statements.").

## BAYVIEW'S POLICIES AND PROCEDURES MAINTAINED TO AVOID VIOLATING THE FDCPA

46.     Bayview maintains a policy entitled "FDCPA Policy," which "describes the manner by which Bayview . . . manages it[s] debt collections in adherence to the [FDCPA]." FDCPA Policy at 1, a copy of which is attached hereto as **Exhibit K**.

47.     "It is the policy of [Bayview] to ensure proper adherence to the provisions and intent of the [FDCPA]" and Bayview "has implemented [the FDCPA Policy] and other related policies, procedures and processes to monitor and control its compliance with the FDCPA." *Id.* at 2.

48.     Bayview's FDCPA Policy states, "It is against [Bayview's ] policy that an agent, in the process of collecting a debt, use any false, deceptive, or misleading representation, including:"

- Falsely representing or implying that the agent is vouched for, bonded by, or affiliated with the United States or any state, including the use of any badge, uniform, or similar identification;

- Falsely representing the character, amount, or legal status of the debt, or of any services rendered, or compensation he or she may receive for collecting the debt;

- Falsely representing or implying that he or she is an attorney or that communications are from an attorney;

- Threatening to take any action which is not legal or intended;

- Falsely representing or implying that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment or sale of any property or wages of any person, unless such action is lawful and intended by the creditor;

- Falsely representing or implying that the sale, referral, or other transfer of the debt will cause the consumer to lose a claim or a defense to payment, or become subject to any practice prohibited by the FDCPA;

- Falsely representing or implying that the consumer committed a crime or other conduct to disgrace the consumer;

- Communicating, or threatening to communicate, false credit information or information known to be false, including not identifying disputed debts as such;

- Using or distributing written communications made to look like or falsely represented to be documents authorized, issued, or approved by any court, official, or agency of the United States or any state if it would give a false impression of its source, authorization, or approval;

- Using any false representation or deceptive means to collect or attempt to collect a debt or to obtain information about a consumer;

- Failing to disclose in the initial written communication with the consumer, and the initial verbal communication if it precedes the initial written communication, that the agent is attempting to collect a debt and that any information obtained will be used for that purpose (Mini Miranda). In addition, the agent must disclose in subsequent communications that the communication is from a debt collector. These disclosures do not apply to a formal pleading made in connection with a legal action;

- Falsely representing or implying that accounts have been sold to innocent purchasers;

- Falsely representing or implying that documents are legal process;

- Using any name other than the true name of the agent's business, company, or organization;

- Falsely representing or implying that documents are not legal processes or do not require action by the consumer; or

- Falsely representing or implying that the BLS employee operates or is employed by a consumer reporting agency.

*Id.* at 4-5.

49.     "The primary responsibility for enforcement of [the FDCPA] policy and its operating procedures rests with the [Bayview] business unit managers and employees."  *Id.* at 2.

11

50.     "Bayview requires employees in any servicing roles to take . . . assigned courses on a regular basis" with regard to the FDCPA.  Rushia Dep. Tr. at 14:11-17, Exh. E; *see also* FDCPA Policy at 7, Exh. K ("All applicable employees are required to complete training and testing on FDCPA rules and regulations on a frequency mandated by the company.").

51.     Bayview requires its employees to complete a "126 pages long . . . on-line training course" on the FDCPA.  Rushia Dep. Tr. at 97:17-24, Exh. E.

52.     Bayview's online FDCPA training course, entitled "Fair Debt Collection Practices Act (FDCPA)" ("FDCPA Course"), a copy of which is attached hereto as **Exhibit L**, includes, among other things, the following instructions to Bayview's employees:

- "Debt collectors cannot misrepresent themselves or state any other false information as a way to mislead the consumer in an attempt to collect a debt."  *Id.* at 13;
- "A debt collector may not . . . Collect any amount that is not permitted by law.*"  Id*. at 76;
- "Debt collectors may not . . . state any false information as a way to mislead the consumer in attempting to collect a debt."  *Id.* at 77;
- "Activities specifically prohibited by the FDCPA include . . . [f]alsely stating the status or amount of a debt."  *Id.*

53.     Clarke Rushia, the "operations manager" of Bayview's servicing department is "responsible for several servicing related functions, one of them is system administration for a number of [Bayview's] applications."  Rushia Dep. Tr. at 13:7-16, Exh. E.

54.     Rushia is trained "with regard to . . . the [FDCPA]," *id*. at 14:11-20, and is "familiar with the [FDCPA] more from a systemic perspective, as far as how it applies to [Bayview's] systems.  What codes would be used to cease and desist.  Things of that nature."  *Id.* at 24:25 through 25:4.

55.     "For example, if a situation occurs where a letter, or statement, or phone call is not to be made for any reason," Rushia would "investigate, determine if there is a code" that

would "stop [that] particular process from occurring." *Id*. at 25:19-25. "If there's not [a pre-existing] code, [Rushia] can create one." *Id*. at 25:25.

## <u>STANDARD OF REVIEW</u>

At the summary judgment stage, a court must determine whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "In making its decision, a court must look to the affidavits or other specific facts pled to determine whether a triable issue exists." *Hostettler v. Auto-Owners Ins. Co.*, 744 F. Supp. 2d 543, 545 (E.D. Va. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1996)). "[I]f the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c), "it is the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial,'" *Hostettler*, 744 F. Supp. 2d at 545 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)). "[D]isposition by summary judgment is appropriate" if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *United States v. Lee*, 943 F.2d 366, 368 (4th Cir. 1991).

"[T]o survive summary judgment, the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). Accordingly, "[w]hen a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 321 n.3 (1986).  If the nonmoving party "does not so respond, summary judgment, if appropriate, shall be entered against him."  *Id.*

## ARGUMENT

Defendants are entitled to summary judgment on all counts of Plaintiff's Complaint because Plaintiff cannot demonstrate a genuine dispute regarding any material fact sufficient to warrant a trial on any of his claims.  First, the Trust is not a "debt collector," for purposes of the FDCPA and, thus, cannot be held liable for any violation of the FDCPA, assuming one occurred. Second, assuming, *arguendo*, that the two statements sent to Plaintiff in December of 2013 were sent in violation of the FDCPA, Plaintiff's claims fail as a matter of law because the undisputed facts in this case demonstrate that Plaintiff received statements only because the man code on Plaintiff's Loan was inadvertently changed during the pre-foreclosure review of the Loan, contrary to Bayview's policies and procedures.   Because Bayview's mistake was made unintentionally, without bad faith, and despite procedures reasonably adapted to avoid such error, and because Plaintiff cannot "set forth specific facts showing that there is a genuine issue for trial" regarding Bayview's *bona fide* error defense, *Celotex*, 477 U.S. at 321 n.3, Bayview is entitled to summary judgment with respect to the alleged FDCPA violation.  *See, e.g., Isaac v. RMB, Inc.*, No. 2:12-cv-2013-TMP, 2014 U.S. Dist. LEXIS 40840, at *31 (N.D. Ala. Mar. 26, 2014) (granting summary judgment to defendant where "plaintiffs' evidence [was] not sufficient to overcome [defendant's] well supported motion for summary judgment based upon the bona fide error defense"), *aff'd*, 604 F. App'x 818 (11th Cir. Mar. 17, 2015) (affirming trial court's holding that defendant's "policies and procedures were reasonably adapted to avoid the kinds of errors that occurred in this case, and that the errors did not occur in bad faith"); *see also Stinson v. Receivables Mgmt. Bureau, Inc.*, 2013 U.S. Dist. LEXIS 41891, at *23 (N.D. Ala. Mar. 26,

2013) (noting that, "even if [defendant] had violated the FDCPA, which it did not, it is still due summary judgment based on the bona fide error defense").

**I.  Plaintiff's claims against the Trust fail as a matter of law.**

Although Plaintiff brings his FDCPA claims against both Bayview and the Trust,[7] the undisputed evidence in this case contradicts Plaintiff's conclusory allegation that neither U.S. Bank nor the Trust is a debt collector.  Moreover, because neither U.S. Bank nor the Trust sent either of the December 2013 statements at issue in this case, the Trust cannot be held liable under the FDCPA, as a matter of law.

**A.  The Trust is not a "debt collector" under the FDCPA.**

The "purpose" of the FDCPA is "to eliminate abusive debt collection practices by *debt collectors*."  15 U.S.C. § 1692 (emphasis added).   The FDCPA "defines 'debt collector' to mean '[1] any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or [2] who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.'"  *Davidson v. Capital One Bank (USA), N.A.*, 2015 U.S. App. LEXIS 14714, at *8-9 (11th Cir. Aug. 21, 2015) (quoting 15 U.S.C. § 1692a(6)).

A "person who meets the definition of 'debt collector' may be excluded from the term if he obtained a debt from another, he is collecting the debt for another, *and* the debt was acquired prior to default."  *Id*. at *11 (citing 15 U.S.C. § 1692a(6)(F)(iii)).   An entity "that do[es] not otherwise meet the definition of 'debt collector'" is not brought "within the ambit of the FDCPA solely because the debt . . . was in default at the time [it] acquired it."  *Id.* at *14.  "One of [the]

---

[7] Plaintiff refers to U.S. Bank, as trustee for the Trust, as ("the Trust") in his Complaint. *See* Compl. at 1, ECF No. 1.  Thus, Defendants' brief follows suit and refers to U.S. Bank and the Trust interchangeably.

two statutory standards [in 15 U.S.C. § 1692a(6)] must still be met."  *Id.* at *13.  "The plaintiff in an FDCPA claim bears the burden of proving the defendant's debt collector status."  *Veres v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 37508, at *32 (D. Colo. Jan. 22, 2014) (citing *Mbaku v. Bank of Am., Nat'l Assoc.*, No. 12-cv-00190-PAB-KLM, 2012 U.S. Dist. LEXIS 185609, 2012 WL 6976973, at *1, 9 (D. Colo. Aug. 20, 2012); *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Caroll & Bertolotti*, 374 F.3d 56, 60 (2d Cir. 2004)).

### 1.  The principal purpose of the Trust is not the collection of debts.

Plaintiff alleges that the "sole purpose of the Trust is the purchase of defaulted mortgage loans . . . and the collection [of] those loans."  Compl. ¶ 10, ECF No. 1.[8]  In support of such allegation, Plaintiff cites a 2013 online news article for the proposition that "securitization of defaulted mortgage loans has become a big business on Wall Street."  *Id.* ¶ 8.  *See* Adam Tempkin, *Bad US mortgage loans now big business on Wall Street*, Reuters, Feb. 19, 2013, http://www.reuters.com/article/2013/02/19/markets-credit-idUSL1N0BJ91220130219 [hereinafter, "*Wall Street*"] (emphasis added).  However, neither the article upon which Plaintiff relies nor the undisputed facts of this case supports his conclusory allegation.

First, according to the online article cited in paragraph 8 of Plaintiff's Complaint, the purpose of real estate investment trusts is to "snap[] up [non-performing loans] at a discount, *hoping to earn returns from their eventual resolution or liquidation*."  *Id.*  Thus, as the phrase "*investment* trusts" implies, the *principal* purpose is to "earn returns," *id.*, not "the purchase of

---

[8] It is unclear how the alleged "*sole* purpose of the Trust" can be both "the purchase of defaulted mortgage loans" *and* "the collection [of] those loans."  Compl. ¶ 10, ECF No. 1 (emphasis added).  *Compare* Webster's II New College Dictionary 1050 (defining "sole" as "Being the only one"), *with* id. at 720 (defining "multiple" as "Having, relating to, or consisting of more than one individual, element, component, or part").  Plaintiff clearly alleges "multiple" purposes of the Trust.

defaulted mortgage loans . . . and the collection [of] those loans," Compl. ¶ 10, ECF No. 1.[9] Indeed, although the Trust may engage in "the purchase of defaulted mortgage loans," Compl. ¶ 10, ECF No. 1, purchasing a loan is only one step toward the Trust's actual purpose of "earn[ing] returns" on the investment, *Wall Street*, *supra*.

Furthermore, although some real estate investment trusts have used loan servicing and debt collection merely as "value creation" tools, the article makes clear that using such tools aid investors by giving them "a better chance of *maximizing returns*" – the real purpose of *investment* trusts. *Id.* (emphasis added). In any event, even if *some* trusts handle their own loan servicing and debt collection in order to create value, as the article suggests, "Bayview has been the only servicer of Plaintiff's Loan since it was transferred to Bayview from the prior servicer on or around February 1, 2013." Rushia Decl. ¶ 7, Exh. F; *see also id.* ¶¶ 5-6 (affirming that neither U.S. Bank nor the Trust engages in debt collection of loans in the Trust).

Thus, according to the allegations and authorities cited in Plaintiff's own Complaint, as well as the undisputed facts regarding U.S. Bank and the Trust, it is clear that the "principal purpose" of the Trust is to earn returns on its investments – not the purchase of loans and collection of debts. *See, e.g., Davidson*, 2015 U.S. App. LEXIS 14714, at *20 (finding plaintiff's allegations insufficient where plaintiff's complaint "provides a basis from which we can plausibly infer that *some* part of Capital One's business is debt collection, but it fails to provide any basis from which we could plausibly infer that the 'principal purpose' of Capital One's business is debt collection"); *Schlegel v. Wells Fargo Bank, NA (In re Schlegel)*, 720 F.3d 1204, 1208-09 (9th Cir. 2013) (dismissing FDCPA claim because the facts alleged by the

---

[9] *See* Merriam-Webster.com at http://www.merriam-webster.com/dictionary/investment (defining "investment" as "the outlay of money usually *for income or profit*" (emphasis added)); *id.* at http://www.merriam-webster.com/dictionary/invest (defining "invest" as "to commit (money) in order *to earn a financial return*" (emphasis added)).

plaintiff "establishe[d] only that debt collection is some part of [defendant's] business, which is insufficient to state a claim under the FDCPA").

### 2. The Trust does not regularly collect or attempt to collect debts owed to another.

Even if the Trust did engage in its own debt collection, such collection does not fall "within the ambit of the FDCPA," as a matter of law, *Davidson*, 2015 U.S. App. LEXIS 14714, at *14, because the Trust does not collect debts owed to another.  The FDCPA "does not define 'another,'" but the Eleventh Circuit has adopted "the common usage of the word," which "most naturally connotes 'one that is different from the first or present one.'"  *Id.* at *15 (quoting Merriam-Webster's Collegiate Dictionary 48 (10th ed. 1996)).  Indeed, "Congress limited the second definition of 'debt collector' to those persons who regularly collect or attempt to collect debts owed or due or asserted to be owed or due *another*, and there is no ambiguity in the words that Congress chose to employ."  *Davidson*, 2015 U.S. App. LEXIS 14714, at *16.  Moreover, the FDCPA expressly excludes from the definition of "debt collector" any person "collecting or attempting to collect a debt . . . to the extent such activity . . . is incidental to a bona fide fiduciary obligation."  15 U.S.C. § 1692a(6)(F).

Here, Plaintiff attempts to circumvent the FDCPA's clear limitation regarding debts owed "to another" by alleging that the Trust collects loans "on behalf of its certificate holders," Compl. ¶ 10, ECF No. 1.  This exact argument was recently considered – and rejected – by the Ninth Circuit in *Junod v. Mortg. Elec. Registration Sys.*, 584 F. App'x 465 (9th Cir. 2014), where the plaintiff alleged that, as here, U.S. Bank, acting as trustee of a Trust, was a "debt collector" because it "collect[ed] debts on behalf of the investors in the . . . Trust," *id.* at 468.  The Court held that, even if U.S. Bank did collect debts owed to the Trust, its actions were "'incidental to a bona fide fiduciary obligation,'" and was therefore "exempt from the FDCPA's definition of

'debt collector.'" *Id.* (quoting 15 U.S.C. § 1692a(6)(F)); *see also Hunt v. U.S. Bank, Nat'l Ass'n*, 2013 U.S. Dist. LEXIS 52422, at *23 (C.D. Cal. Apr. 3, 2013) ("Plaintiffs have pleaded U.S. Bank's status as a fiduciary, and thus pleaded themselves into the exemption in § 1692a(6)(F)(i)."); *Bernardi v. Deutsche Bank Nat'l Trust Co. Am.*, 2013 U.S. Dist. LEXIS 6735, at *16 (N.D. Cal. Jan. 15, 2013) (holding trustee was not debt collector because it "appears to have been collecting payments pursuant to its fiduciary duty to the . . . Trust investors"). Accordingly, because "creditors and their fiduciaries are not 'debt collectors' subject to the Act," *Hasbun v. Recontrust Co., N.A.*, 508 F. App'x 941, 942 (11th Cir. 2013), Plaintiff has "pleaded [himself] into the exemption in § 1692a(6)(F)(i)" and, as a matter of law, neither U.S. Bank, as trustee of the Trust, nor the Trust, acting on behalf of its own certificate holders, is a "debt collector" for purposes of the FDCPA.

**B. The Trust did not engage in debt collection with respect to Plaintiff's Loan.**

Even if the Trust satisfied the FDCPA's statutory definition of "debt collector," the undisputed facts of this case confirm that the Trust did not engage in any debt collection regarding Plaintiff's Loan. To be sure, "'in order to state a plausible FDCPA claim under § 1692e, a plaintiff must allege . . . that the challenged conduct is related to debt collection.'" *Dunavant v. Sirote & Permutt, P.C.*, 603 F. App'x 737, 739 (11th Cir. 2015) (quoting *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1216 (11th Cir. 2012)).

Bayview's corporate representative testified at his deposition that, when a loan is coded in Bayview's servicing system as a foreclosure, "[d]ebt collection at that point ceases." Rushia Dep. Tr. at 60:11-15, Exh. E. When Bayview "received [Plaintiff's] loan from the prior servicer," the Loan was "coded as a foreclosure, which prevents statements from going out," *id.* at 46:7-8. Indeed, throughout the pendency of Plaintiff's foreclosure, no statements were ever sent to Plaintiff. *Id.* at 46:23-24. Instead, Plaintiff's Loan was handled by the foreclosure

department, which merely completed the steps necessary to conduct the foreclosure sale of the Property.

Moreover, it cannot be disputed that the Trust did not send either of the December 2013 statements to Plaintiff.  *See* Compl. ¶¶ 38-39, ECF No. 1 (alleging that "Bayview, pursuant to its agreement with the Trust, sent Plaintiff" the statements).  Nowhere in either statement is the Trust even mentioned, *see, e.g.*, Compl. Exhs. 1-2, ECF No. 1-1, 1-2.  The September 27, 2013 "Change of Creditor Notification" informed Plaintiff that Bayview, "agent or party having authority to act on behalf of the [Trust]," remained the "servicing entity" of Plaintiff's Loan. Sept. 27, 2013 Change of Creditor Notification, Exh. D.  Accordingly, because the undisputed facts affirmatively demonstrate that the Trust is not a "debt collector" for purposes of the FDCPA and, in any event, the Trust did not engage in any debt collection with respect to Plaintiff's Loan, all claims against the Trust must be dismissed as a matter of law.

## II.   Bayview is entitled to the protection of the FDCPA's *bona fide* error defense.[10]

Assuming, *arguendo*, that Bayvew sent the December 2013 statements to Plaintiff in violation of the FDCPA,[11] the undisputed evidence in this case affirmatively demonstrates that Bayview is entitled to the protection of the *bona fide* error defense included in the FDCPA. Although sometimes described "as a strict liability statute," *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1189 (11th Cir. 2010), the FDCPA provides "a narrow carve-out to the general rule of strict liability, known as the 'bona fide error' defense."  *Owen v. I. C. Sys., Inc.*, 629 F.3d 1263, 1271 (11th Cir. 2011).

---

[10] To the extent the Court finds that the Trust is a debt collector for purposes of the FDCPA, the *bona fide* error defense also applies to the Trust and U.S. Bank, acting on its behalf.

[11] Bayview does not concede that the December 2013 statements violated the FDCPA, but assumes so *only* for the purposes of the instant motion.

"To assert the bona fide error defense, a debt collector must prove by a preponderance of evidence that its violation of the FDCPA was unintentional and was the result of a bona fide error, despite procedures reasonably adapted to avoid errors." *Isaac v. RMB Inc.*, 604 F. App'x 818, 820 (11th Cir. 2015) (citing 15 U.S.C. § 1692k(c)).  In other words, a debt collector is not liable for any FDCPA violation that "(1) was 'not intentional'; (2) was 'a bona fide error'; and (3) occurred despite the maintenance of procedures 'reasonably adapted to avoid any such error.'" *Owen*, 629 F.3d at 1271 (quoting *Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1352-53 (11th Cir. 2009)).

**A.  It is undisputed that any FDCPA violation by Bayview was unintentional.**

"The starting point for proving the bona fide error defense is proving that the violation was unintentional." *Christopher v. RJM Acquisitions LLC*, 2015 U.S. Dist. LEXIS 12452, at *14 (D. Ariz. Feb. 3, 2015) (citing  15 U.S.C. 1692k(c)).  "A debt collector need not show that its actions were unintentional, but merely that the FDCPA violation was unintentional."  *Isaac v. RMB, Inc.*, 2014 U.S. Dist. LEXIS 40840, *21-22 (N.D. Ala. Mar. 26, 2014) (citing *Bacelli v. MFP, Inc.*, 729 F. Supp. 2d 1328, 1333 n. 6 (M.D. Fla. 2010)), *aff'd*, 604 F. App'x 818 (11th Cir. Mar. 17, 2015).  Although "the intent prong of the bona fide error defense is a subjective test, . . . subjective intent can often only be shown by inferential evidence." *Johnson v. Riddle*, 443 F.3d 723, 728 (10th Cir. 2006).  "Evidence of [a defendant's] training for debt collectors and its written admonitions" regarding conduct prohibited by the FDCPA can demonstrate the lack of "inten[t] to violate the FDCPA." *Totten v. Evergreen Prof'l Recoveries, Inc.*, 2014 U.S. Dist. LEXIS 115523, at *5 (E.D. Wash. Aug. 19, 2014).

Here, no reasonable jury could conclude that Bayview intended to violate the FDCPA by sending Plaintiff the December 2013 statements to Plaintiff.  First, Bayview requires its employees to complete extensive training in order to avoid violating the FDCPA.  *See* Rushia

Dep. Tr. at 14:11-17, Exh. E ("Bayview requires employees in any servicing roles to take . . . assigned courses on a regular basis" with regard to the FDCPA); FDCPA Policy at 7, Exh. K ("All applicable employees are required to complete training and testing on FDCPA rules and regulations on a frequency mandated by the company."). Bayview also maintains man codes in its MSP servicing program to suppress monthly statements on loans in foreclosure, such as Plaintiff's. *See* Rushia Dep. Tr. at 46:8, Exh. E (testifying that Plaintiff's Loan was "coded as a foreclosure, which prevents statements from going out"). This, in itself, demonstrates Bayview's "lack of "inten[t] to violate the FDCPA." *Totten*, 2014 U.S. Dist. LEXIS 115523, at *5.

Second, the undisputed evidence demonstrates that Ms. Peterson did not intend to reactivate Plaintiff's Loan in RAM and cease the suppression of Plaintiff's statements. Nothing in Ms. Peterson's pre-foreclosure checklist *instructed* her to "reactivate[] the loan in RAM," Rushia Dep. Tr. at 49:16-20, Exh. E, nor was there any reason to do so, as "[the Loan] was clearly headed for a foreclosure sale," *id.* at 53:14-17. Furthermore, none of Ms. Peterson's comments on the checklist indicated that she had intentionally "reactivated the loan in RAM," *id.* at 49:16-20, so that Plaintiff would begin to receive statements. Rather, Ms. Peterson indicated only that she had "email[ed] AM and CC'd AM manager to upload Hamp Cert," Operations Quality Control Analyst Loan Audit – Pre Foreclosure Sale Checklist at 3, Exh. H, during which she mistakenly reactivated Plaintiff's Loan.

Finally, the undisputed fact that Plaintiff received only two monthly statements after the foreclosure sale, and that Bayview "ceased all communications" as soon as it discovered the error, indicates that any violation of the FDCPA was unintentional. *See Isaac*, 2014 U.S. Dist. LEXIS 40840, at *24 (distinguishing the case from another case where the plaintiff "did not complain that the debt collector took days or months to process her request to cease: she

complained that the debt collector simply ignored her request for almost three years - apparently until she filed a lawsuit"). Accordingly, the undisputed facts of this case affirmatively demonstrate that Ms. Peterson's inadvertent coding error on Plaintiff's Loan, resulting in the alleged FDCPA violation, was unintentional.

**B. It is undisputed that any error by Bayview was made in good faith.**

It also cannot by disputed that any error by Bayview "resulting in a violation [of the FDCPA] was 'made in good faith; a genuine mistake, as opposed to a contrived mistake.'" *Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1353 (11th Cir. 2009) (citing *Black's Law Dictionary* 186 (8th ed. 2004) (defining "bona fide" as "1. Made in good faith; without fraud or deceit" and "2. Sincere; genuine")). "To be considered a bona fide error, the debt collector's mistake must be objectively reasonable." *Id*. (citing *Johnson v. Riddle*, 443 F.3d 723, 729 (10th Cir. 2006) ("[I]n effect, [the bona fide] component serves to impose an objective standard of reasonableness upon the asserted unintentional violation.")).

There is no evidence whatsoever of any bad faith by Bayview in sending the December 2013 statements to Plaintiff. Indeed, Bayview had successfully suppressed all monthly statements regarding Plaintiff's Loan for the previous ten months by coding the Loan as a foreclosure, Rushia Dep. Tr. at 46:23-24, Exh. E, and had no reason to believe that Plaintiff's man code would be changed during the pre-foreclosure audit. Moreover, it is not objectively reasonable to require or expect a debt collector to manually check every loan in its system before sending each statement, in order to verify that the man code has not been changed since the last statement. *Cf. Hyman v. Tate*, 362 F.3d 965, 968 (7th Cir. 2004) ("Although [the debt collector] could have done more . . ., § 1692k(c) only requires collectors to adopt reasonable procedures."). In any event, Bayview's prompt correction of the error upon its discovery further evidences that

Bayview's error was "a genuine mistake, as opposed to a contrived [one]." *Edwards*, 584 F.3d at 1353. Accordingly, Bayview is entitled to a finding that, as a matter of law, the alleged FDCPA violation was committed in good faith.

### C. It is undisputed that any error by Bayview occurred despite procedures reasonably adapted to prevent the error from occurring.

The undisputed evidence also demonstrates that the alleged FDCPA violation occurred despite Bayview's policies and procedures, which were reasonably adapted to avoid any such error. The Eleventh Circuit has adopted a two-step inquiry to determine the "procedures" prong of the FDCPA's *bona fide* error defense. *See Owen,* 629 F.3d at 1274. "The first step is whether the debt collector maintained — *i.e.*, actually employed or implemented — procedures to avoid errors." *Id.* at 1274 (internal quotation omitted).

"The second step is whether the procedures were reasonably adapted to avoid the specific error at issue." *Id.* (internal quotation omitted). "The FDCPA does not require that the procedures be fool proof; rather, it is enough that the procedures are 'reasonably adapted to avoid any such error.'" *Frye v. Bowman*, 193 F. Supp. 2d 1070, 1088 (S.D. Ind. 2002) (quoting 15 U.S.C. § 1692k(c)); *see also Rhinehart v. CBE Grp., Inc.*, 714 F. Supp. 2d 1183, 1185 (M.D. Fla. 2010) (observing that the "procedures need not be foolproof" (citing *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 538-39 (7th Cir. 2005)). Furthermore, although "[t]he FDCPA requires the debt collector to maintain procedures, [it] does not state that they must be in written form." *Stinson v. Receivables Mgmt. Bureau, Inc.*, 2013 U.S. Dist. LEXIS 41891, at *21 (N.D. Ala. Mar. 26, 2013) (citing 15 U.S.C. § 1692k(c)).

### 1. Bayview maintains procedures to avoid violating the FDCPA.

Bayview maintains extensive policies and procedures designed to generally avoid violating the FDCPA. Bayview's corporate representative testified that Bayview requires its

employees to complete a "126 pages long . . . on-line training course" on the FDCPA.  Rushia Dep. Tr. at 97:17-24, Exh. E.  The online training course instructs Bayview's employees that debt collectors may not state any "false information as a way to mislead the consumer in an attempt to collect a debt," FDCPA Course at 13, 77, Exh. L, "[c]ollect any amount that is not permitted by law," *id*. at 76, or "[f]alsely stat[e] the status or amount of a debt, *id*. at 77. Bayview's separate "FDCPA Policy" instructs employees that it is against Bayview's policy to "[f]alsely represent[] the character, amount, or legal status of the debt, "[t]hreaten[] to take any action which is not legal or intended," or "[u]s[e] any false representation or deceptive means to collect or attempt to collect a debt."  FDCPA Policy at 4-5.  Bayview delegates "[t]he primary responsibility for enforcement of [the FDCPA] policy and its operating procedures [to Bayview's] business unit managers and employees."  *Id*. at 2.

Bayview also maintains procedures to avoid the specific FDCPA violations alleged in Plaintiff's Complaint.  Specifically, Bayview maintains a detailed Pre Foreclosure Sale Checklist, *see* Exh. H, which contains specific instructions for Bayview employees when completing pre-foreclosure loan reviews.  Nowhere in the Pre Foreclosure Sale Checklist are Bayview employees instructed to reactivate a borrower's loan, which changes the man code on the loan and allows statements to be sent to the borrower during foreclosure.

## 2. Bayview's procedures were reasonably adapted to specifically avoid sending Plaintiff the December 2013 statements.

Bayview's procedures were also reasonably adapted to avoid the FDCPA violation alleged by Plaintiff in this case.  Clarke Rushia, Bayview's Operations Manager in the Servicing Department, testified that he is "familiar" with the FDCPA "from a systemic perspective, as far as how it applies to [Bayview's] systems.  What codes would be used to cease and desist.  Things of that nature."  Rushia Dep. Tr. at 24:25 through 25:4, Exh. E.  "For example, if a situation

occurs where a letter, or statement, or phone call is not to be made for any reason," Rushia would "investigate, determine if there is a code" that would "stop [that] particular process from occurring." *Id*. at 25:19-25. "If there's not [a pre-existing] code, [Rushia] can create one." *Id*. at 25:25.

Rushia also testified that, when Plaintiff's Loan was transferred to Bayview "from the prior servicer, the Loan was coded as a foreclosure, which prevents statements from going out." *Id*. at 46:7-9. Indeed, as Rushia testified, "no statements went out" on Plaintiff's Loan until December 2, 2013 – ten months after the Loan was transferred to Bayview. *Id*. at 46:22-24. It was only when "the man code indicating a foreclosure was inadvertently removed" that the December 2013 statements were "actually issue[d]." *Id*. at 47:3-5. Thus, it is undisputed that, had Ms. Peterson not inadvertently reactivated Plaintiff's Loan, thus changing the man code on Plaintiff's Loan "from an F, which denotes foreclosure, . . . to an A, that reassign[ed] it to asset management," *id*. at 48:14-18, Bayview's system would have continued to suppress Plaintiff's monthly statements, just as it had for the previous ten months. Accordingly, because (1) Bayview has demonstrated by a preponderance of the evidence that it is entitled to the protection of the FDCPA's *bona fide* error defense, and (2) Plaintiff cannot set forth any "specific facts" through "his response, by affidavits or as otherwise provided in [Rule 56]," *Celotex*, 477 U.S. at 321 n.3, Bayview is entitled to summary judgment as a matter of law and Plaintiff's Complaint should be dismissed with prejudice.

## CONCLUSION

WHEREFORE, Bayview Loan Servicing, LLC and U.S. Bank National Association, as trustee, in trust for the benefit of the holders of Bayview Opportunity Master Fund IIIa REMIC Trust 2013-14NPL 1 Beneficial Interest Certificates, Series 2013-14NPL 1 respectfully request that the Court grant their Motion for Summary Judgment, dismiss this action with prejudice, and

award all other relief as this Court deems equitable and just.

October 15, 2015                              Respectfully submitted,

                                             **BAYVIEW LOAN SERVICING, LLC and U.S.
                                             BANK NATIONAL ASSOCIATION, AS
                                             TRUSTEE, IN TRUST FOR THE BENEFIT OF
                                             THE HOLDERS OF BAYVIEW
                                             OPPORTUNITY MASTER FUND IIIa REMIC
                                             TRUST 2013-14NPL 1 BENEFICIAL
                                             INTEREST CERTIFICATES, SERIES 2013-
                                             14NPL 1**

                                             /s/      John C. Lynch
                                             John C. Lynch, Esq. (*Admitted Pro Hac Vice*)
                                             David M. Gettings, Esq. (*Admitted Pro Hac Vice*)
                                             Jason E. Manning, Esq. (*Admitted Pro Hac Vice*)
                                             TROUTMAN SANDERS LLP
                                             222 Central Park Avenue, Suite 2000
                                             Virginia Beach, VA 23462
                                             Telephone: (757) 687-7747
                                             Email: john.lynch@troutmansanders.com
                                             Email: david.gettings@troutmansanders.com
                                             Email: jason.manning@troutmansanders.com


                                             Christopher A. Bottcher (ASB-2085-T68C)
                                             McGlinchey Stafford
                                             2100 South Bridge Parkway, Suite 650
                                             Birmingham, AL 35209
                                             Tel: 800-736-7656
                                             Fax: 205-278-6904
                                             Email: cbottcher@mcglinchey.com

                                             ***Counsel for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of October, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

### Counsel for Plaintiff Robert L. Arnold

Earl P. Underwood , Jr.
Underwood & Riemer, PC
21 South Section Street
Fairhope, AL 36532
251-990-5558
Fax: 251-990-0626
Email: epunderwood@gmail.com

Kenneth J. Riemer
P. O. Box 1206
Mobile, AL 36633
(251) 432-9212
Fax: (251) 990-0626
Email: kriemer01@gmail.com

/s/      John C. Lynch
John C. Lynch, Esq. (*Admitted Pro Hac Vice*)
David M. Gettings, Esq. (*Admitted Pro Hac Vice*)
Jason E. Manning, Esq. (*Admitted Pro Hac Vice*)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7747
Email: john.lynch@troutmansanders.com
Email: david.gettings@troutmansanders.com
Email: jason.manning@troutmansanders.com

Christopher A. Bottcher (ASB-2085-T68C)
McGlinchey Stafford
2100 South Bridge Parkway, Suite 650
Birmingham, AL 35209
Tel: 800-736-7656
Fax: 205-278-6904
Email: cbottcher@mcglinchey.com

*Counsel for Defendants*

26847421