## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROBERT L. ARNOLD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 14-0543-WS-C** |
| | ) | |
| **BAYVIEW LOAN SERVICING, LLC,** | ) | |
| *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment (doc. 59), Defendants' Motion to Seal (docs. 57 & 58), and Plaintiff's Motion for Leave to File Sur-Reply (doc. 76).[1]  In the undersigned's discretion, the Motion for Leave to File Sur-Reply is **granted**, and the Court will consider both plaintiff's Sur-Reply (doc. 76-1) and defendants' substantive response to same (*see* doc. 80) in adjudicating the pending Motion for Summary Judgment.

---

[1]     Also pending are plaintiff's Motion for Class Certification (doc. 56) under Rule 23, Fed.R.Civ.P., and various Motions relating to same (docs. 61, 70).  All such Motions have been briefed.  Under the circumstances, the Court finds it appropriate to address the Rule 56 Motion first in the interests of efficiency and judicial economy, and in the absence of any reason to believe that either plaintiff or putative class members will be unfairly prejudiced.  *See generally Smith v. Network Solutions, Inc.*, 135 F. Supp.2d 1159, 1165 (N.D. Ala. 2001) (deeming it "appropriate to address the merits of Defendants' motion to dismiss or for summary judgment prior to addressing the issue of Plaintiff's motion for class certification, given the nature of the pending dispositive motion and the absence of prejudice to putative class members"); *Thornton v. Mercantile Stores Co.*, 13 F. Supp.2d 1282, 1289 (M.D. Ala. 1998) ("Ruling on a dispositive motion prior to addressing class certification issues may be appropriate where there is sufficient doubt regarding the likelihood of success on the merits  of a plaintiff's claims, … where inefficiency would result, … or where neither plaintiffs nor members of a putative class would be prejudiced.") (citations omitted); *Shepherd v. Pilgrim's Pride Corp.*, 2007 WL 781883, *2 (N.D. Ga. Mar. 12, 2007) ("courts have recognized that, at least in some cases, it may be appropriate in the interest of judicial economy to resolve a motion for summary judgment or a motion to dismiss prior to ruling on class certification").

I.      **Nature of the Case.**

In his First Amended Complaint (doc. 66), plaintiff, Robert L. Arnold, purporting to proceed individually and on behalf of similarly situated individuals, brought claims against Bayview Loan Servicing, LLC ("Bayview"), and U.S. Bank National Association, as trustee, in trust for the benefit of the Holders of Bayview Opportunity Master Fund IIIa REMIC Trust 2013-14NPL 1 Beneficial Interest Certificates, Series 2013-14NPL-1 ("U.S. Bank"), for violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* (the "FDCPA"). According to the First Amended Complaint, Bayview (servicer) and U.S. Bank (owner/holder) violated §§ 1692d, 1692e and 1692f(1) of the FDCPA by sending two "Monthly Billing Statements" to Arnold for his mortgage loan in December 2013.  Arnold's position is that these bills violated the FDCPA because (i) "Plaintiff's debt had been discharged" (doc. 66, ¶ 41), (ii) sending the statements "constitutes harassment" (*id.*, ¶ 42), (iii) the statements were "deceptive because they imply that Plaintiff owes money on the discharged mortgage loan" (*id.*, ¶ 43), (iv) the balance recited on the statements "was grossly inflated because the defendants are not entitled to collect, again, amounts that were paid at the foreclosure sale" (*id.*, ¶ 44), and (v) the listed balances "are not accurate because the statements do not credit Plaintiff with the amount paid at the foreclosure sale" (*id.*, ¶ 45).

Defendants' Answer (doc. 10) filed on January 9, 2015 raised 11 purported affirmative defenses, one of which bears particular relevance to the pending Rule 56 Motion.  As their fourth affirmative defense, defendants pleaded as follows: "Plaintiff's individual and class claims are barred by the bona fide error defense pursuant to the FDCPA, 15 U.S.C. § 1692, *et seq.*"  (Doc. 10, at 13.)  The Answer did not elaborate further; however, at no time did plaintiffs move to strike such defense pursuant to Rule 12(f), Fed.R.Civ.P.

II.     **Motion to Seal.**

Before turning to the Rule 56 Motion, the Court pauses to consider the status of four exhibits addressed in Defendants' Motion to Seal.[2]  The vast majority of defendants' summary

---

[2]        In an apparent clerical error, defendants filed two identical copies of their Motion to Seal (*compare* docs. 57 & 58), one of which attached the four exhibits for which sealed status was sought, and the other of which did not.  Of course, there was no need to file the same Motion twice.  The redundant iteration of the Motion to Seal (doc. 57) that omitted copies of the subject exhibits is **moot**.

judgment filings in this matter have been presented in unsealed, publicly accessible form. Through this Motion, however, defendants seek sealed status for four discrete summary judgment exhibits, to-wit: (i) a one-page exhibit from an internal Bayview manual concerning loan codes (Exhibit G); (ii) a one-page exhibit from an internal Bayview manual concerning functions of the Asset Management Department (Exhibit J); (iii) a nine-page exhibit consisting of Bayview's internal FDCPA Policy (Exhibit K); and (iv) a four-page exhibit reflecting portions of a FDCPA training course utilized by Bayview (Exhibit L).

     Federal courts have long recognized a strong presumption in favor of allowing public access to judicial records. *See, e.g., Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) ("The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process. … [T]he common-law right of access includes the right to inspect and copy public records and documents."). "Indeed, the common law right of public access to judicial documents is said to predate the Constitution." *United States v. Byrd*, 11 F. Supp.3d 1144, 1148 (S.D. Ala. 2014) (citation and internal marks omitted). The presumption of access extends to "[m]aterial filed in connection with any substantive pretrial motion, unrelated to discovery," and to any "motion that is presented to the court to invoke its powers or affect its decisions." *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007) (citations and internal quotation marks omitted). "Litigants may not override that presumption by simply referencing a protective order." *Allstate Ins. Co. v. Regions Bank*, 2015 WL 4073184, *2 n.3 (S.D. Ala. July 2, 2015); *see also Suell v. United States*, 32 F. Supp.3d 1190, 1192 (S.D. Ala. 2014) ("[t]he mere existence of a protective order does not automatically override the public's right of access"). In recognition of these principles, the Local Rules require any party seeking a sealing order to set forth "[t]he basis upon which the party seeks the order, including the reasons why alternatives to sealing are inadequate." General L.R. 5.2(b)(2)(B). In so doing, "the party seeking to maintain secrecy must establish good cause for continued protection under Rule 26." *Suell v. United States*, 32 F. Supp.3d 1190, 1192 (S.D. Ala. 2014) (citation and internal quotation marks omitted).

     Upon review of the Motion to Seal, the Court finds that defendants have adequately established "good cause" why the Clerk of Court should maintain the four enumerated exhibits under seal. In particular, defendants have shown that those particular exhibits contain

confidential, proprietary information relating to Bayview's business operations that could irreparably harm Bayview if made public; that no reasonable alternatives to sealing these exhibits would protect the commercially sensitive information from disclosure; that the interests of Bayview in maintaining confidentiality of this small subset of defendants' exhibits outweigh the public's interest in accessing judicial records (particularly where the public will have unfettered access to numerous other exhibits, the parties' summary judgment briefs, and this Order); and that the Rule 26 good cause balancing test thus favors sealing the exhibits. Accordingly, Defendants' Motion to Seal (doc. 58) is **granted**.  Exhibits G, J, K and L to defendants' Motion for Summary Judgment (docs. 58-1, 58-2, 58-3 & 58-4) are **sealed**. However, the Clerk's Office is directed to **unseal** the Motion to Seal (doc. 58) itself.  While the appended exhibits are confidential and proprietary, the Motion is not.  General L.R. 5.2(b)(2) specifically provides that motions to seal are to be filed as unsealed documents.

III.    **Relevant Background.**[3]

    A.      ***The Underlying Loan, Default and Foreclosure.***

    The material facts are largely undisputed and uncontroversial.  Back in 2001, Arnold bought a house on Pineview Place in Gulf Shores, Alabama, that he used as a primary residence. (Arnold Dep. (doc. 60, Exh. A), at 16-17.)[4]  In September 2005, Arnold refinanced the mortgage

---

[3]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, Arnold's evidence is taken as true and all justifiable inferences are drawn in his favor.  Also, federal courts cannot weigh credibility at the summary judgment stage.  *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [Arnold's] version of the facts drawing all justifiable inferences in [his] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[4]     The Local Rules require litigants to provide chambers with courtesy copies of voluminous exhibits.  *See* Civil L.R. 7(g) ("If a party's exhibits in support of, or in opposition to, a motion exceed fifty (50) pages in the aggregate, that party must submit a courtesy copy to chambers.").  In this respect, the Local Rules echo Magistrate Judge Cassady's Rule 16(b) Scheduling Order in this case, which provides that "[i]f a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to Chambers by mail or hand delivery."  (Doc. 18, ¶ 12(c).)  Plaintiff has complied with this requirement; however, defendants have not.  In its discretion, and to avoid (Continued)

loan on that property for $245,000, but subsequently fell behind on his payments.  (*Id.* at 17, 37.)
On June 7, 2012, after he was in default of his loan for nonpayment, Arnold filed a petition for
Chapter 7 protection in U.S. Bankruptcy Court for the Southern District of Alabama, listing the
note and mortgage on the appropriate liability schedules.  (Arnold Decl. (doc. 73, Exh. 1), ¶¶ 5-
7.)  On September 21, 2012, Bankruptcy Judge Mahoney entered a Discharge of Debtor in which
she ordered that Arnold "is granted a discharge" under 11 U.S.C. § 727.  (Arnold Decl., ¶ 9 &
Exh. A.)  Arnold had moved out of the Pineview Place residence in the summer of 2012, after
which it was vacant.  (S. Arnold Dep. (doc. 73, Exh. 2), at 47.)

    In January 2013, Arnold received written notification that "[e]ffective February 1, 2013,
your mortgage loan servicing will be transferred … to Bayview Loan Servicing, Inc."  (Arnold
Decl., ¶ 11 & Exh. C.)  And in September 2013, Arnold received written notification that
ownership of his loan had been transferred to U.S. Bank; however, that notice reaffirmed
Bayview's role as servicer and point of contact for the loan.  (*Id.*, ¶ 12 & Exh. D.) Bayview has
been the only servicer of Arnold's mortgage loan since it was transferred to Bayview from a
prior servicer on February 1, 2013.  (Rushia Decl. (doc. 60, Exh. F), ¶ 7.)  At no time did U.S.
Bank engage in any activities to collect any debt or service any loan contained in the Bayview
Opportunity Masterfund IIIa REMIC Trust 2013-14NPL 1 Beneficial Interest Certificates, Series
2013-14NPL 1 (the "Trust").  (*Id.*, ¶¶ 3-6.)[5]

    The record is clear that, from the time it began servicing the loan in February 2013,
Bayview knew that Arnold's loan was in default and that the accompanying debt had been
discharged in bankruptcy.  (Rushia Dep., at 22, 23, 32 , 37, 59-60.)  After Bayview assumed

---

delaying resolution of the summary judgment motion, the Court takes the Motion under
submission without entering another order reminding defendants to submit hard copies that
should have been furnished some time ago.

    [5]    For purposes of this Order, the undersigned may characterize defendant U.S.
Bank as the owner of Arnold's loan.  A more technically precise description is that the Trust
actually owned the loan (*see* Rushia Dep., at 20), with U.S. Bank acting in the capacity of
Trustee for the Trust.  The distinction is immaterial for this summary judgment analysis;
therefore, as a convenient shorthand and to minimize confusion, this Order will refer to U.S.
Bank as the owner of the loan during the relevant time period; however, it should be understood
that references to U.S. Bank include the Trust, as well.

these servicing responsibilities, the foreclosure process was started and the Pineview Place property went into foreclosure based on Arnold's default. (*Id.* at 59.) Bayview purchased the subject property for the sum of $238,800.00 at a foreclosure sale conducted on November 25, 2013. (Arnold Decl., ¶ 13 & Exh. E.) The foreclosure sale amount covered most of the $244,038.97 outstanding principal balance on Arnold's loan.

## B. *Bayview Billing Statements in December 2013.*

Defendant's evidence shows, and plaintiff concedes, that from February 1, 2013 (when Bayview began servicing the loan) through December 1, 2013, Arnold never received a single written billing statement from Bayview. (Doc. 73, at 3; Rushia Dep., at 46 ("This was coded with a foreclosure man code, which prevented any statements from going out, and no statements went out until this one on 12/2.").)[6] In December 2013, however, Arnold received two "Monthly Billing Statements" from Bayview, one dated December 2, 2013 and the other dated December 16, 2013. (Arnold Decl., ¶¶ 14-15.)[7]

---

[6]     To be sure, plaintiff identifies various other objectionable contacts from Bayview between February 2013 and July 2013, including "harassing" letters regarding lack of insurance on the property, telephone calls placed directly to Arnold (rather than to his attorney) and the like. (Doc. 73, at 3-4.) Nonetheless, Arnold's FDCPA claims asserted in this litigation do not relate to these contacts, but are confined solely to the two December 2013 billing statements. (Doc. 66, ¶¶ 37-46.) As Arnold admits in his Amended Complaint, "Contacts made during the one-year limitations period of the FDCPA include two made during December of 2013" (*id.*, ¶ 37), suggesting (accurately) that the prior contacts are outside the relevant limitations period and therefore not actionable here. Because Arnold's FDCPA claim hinges solely on the two December 2013 billing statements, the analysis herein will focus on those contacts, as opposed to earlier Bayview letters or telephone calls as to which Arnold is not seeking relief under the FDCPA in this action. The Court understands that those previous contacts may be germane to a separate contempt proceeding that Arnold is pursuing against Bayview in Bankruptcy Court (*see* doc. 75, at 3); however, they do not form the basis of any FDCPA claim asserted here. Also, plaintiff has not brought a claim against Bayview in this action under 22 U.S.C. § 524 for violation of the bankruptcy discharge injunction, nor could he validly do so. *See Church v. Accretive Health, Inc.*, 2014 WL 7184340, *12 (S.D. Ala. Dec. 16, 2014) ("[T]his Court has no qualms about hewing to the overwhelming weight of the case law that refuses to recognize a private right of action (*i.e.*, a new, judicially created remedy, above and beyond the carefully articulated set of rights and remedies fashioned by Congress in the Bankruptcy Code) for § 524(a)(2) violations."). In short, Arnold's claims herein turn on the two billing statements, not anything else that Bayview did or failed to do in servicing the loan.

[7]     To be precise, Bayview did not actually transmit the statements to Arnold itself; rather, it retained a third-party vendor in Jacksonville, Florida to do so on Bayview's behalf. (Continued)

Each of these statements purported to reflect an outstanding principal balance of $244,038.97 on Arnold's loan, with a past due balance in excess of $34,000.  (*Id.*)  Neither of these billing statements recited any credits or adjustments to the balance to account for the foreclosure sale that had taken place on November 25, 2013.  (Rushia Dep., at 54-55.)  Nor did these bills reference Arnold's bankruptcy discharge in September 2012.  Rather, the December 2 statement indicated "Payment Amount Due $34,457.79," and the December 16 statement specified "Payment Amount Due $35,926.10," each listing a "Payment Due Date" of January 1, 2012 (*i.e.*, 23 months earlier).  (Arnold Decl., at Exh. F & G.)  The fourth page of each statement included a pre-printed disclaimer, reading in part as follows:

> "To the extent that your obligation has been discharged or is subject to an automatic stay of bankruptcy this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect such obligation."

(*Id.*)

Sometime later, Bayview researched the circumstances that led to the issuance of the December 2 and December 16 billing statements to Arnold.  (Rushia Dep., at 45-46.)  To understand Bayview's conclusions, one must have a basic working knowledge of its servicing system.  At all relevant times, Bayview used a computer system whose servicing component was known as Mortgage Servicing Package ("MSP").  (*Id.* at 26.)  Through the MSP platform, Bayview utilized fields, called "codes," to "drive[] other processes" relating to the servicing of a particular loan.  (*Id.*)  Each code is "a field that is inside the system that [can] be populated by either a user, or a process."  (*Id.* at 27.)  For example, if a loan arrives at Bayview in an active bankruptcy, then Bayview uses a code in the MSP system to "put[] the loan into an entirely different area of servicing.  It's under the jurisdiction of the bankruptcy department."  (*Id.* at 33.)[8]  Arnold's loan was not coded for the bankruptcy department, because the underlying

_____

(Rushia Dep., at 42.)  While it may be of academic interest, that distinction is not material to any issue before the Court on summary judgment.

[8]       The MSP system uses what is called a "man code" or a "person code" to indicate which specific department within Bayview (*i.e.*, foreclosure department, bankruptcy department, asset management department, etc.) is handling a particular loan file.  (Doc. 58, Exh. G; Rushia Decl., ¶ 13.)  These codes are significant because Bayview "can code the loan … with the appropriate man code that would stop the statement from being issued" in cases such as (Continued)

bankruptcy proceedings had concluded several months before Bayview assumed servicing responsibilities.  (*Id.*)  Instead, when Bayview received Arnold's loan from the prior servicer, "the loan was coded as a foreclosure, which prevents statements from going out."  (*Id.* at 46.)  In other words, Bayview's use of a foreclosure code in the MSP system for Arnold's loan automatically suppressed billing statements from being issued to Arnold after Bayview began servicing the loan in February 2013, resulting in no statements going out until December 2, 2013.  (*Id.*)  Because Arnold's loan was coded for foreclosure, Bayview's perspective was that "[d]ebt collection at that point ceases."  (*Id.* at 60.)  Bayview was not attempting to collect on the Arnold loan when it began servicing same; rather, Bayview's role was limited to exploring whether other pre-foreclosure options might allow Arnold to retain his home, if he so desired.  (*Id.* at 130.)

The obvious question is why Bayview sent monthly billing statements to Arnold on December 2, 2013 and December 16, 2013, even though his loan had been properly coded as a foreclosure to suppress the issuance of such statements for the previous ten months.  Bayview's investigation revealed (and plaintiff has not disputed) that "the man code indicating a foreclosure was inadvertently removed, which allowed the statement process to actually issue a statement" to Arnold on two occasions in December 2013.  (Rushia Dep., at 47.)  Bayview's corporate representative was unaware of this erroneous code removal happening to any other borrowers whose loans Bayview was servicing.  (*Id.* at 47, 51; Rushia Decl., ¶ 20.)  Indeed, Bayview certified in written discovery responses that "Plaintiff was the only consumer affected by the inadvertent error that caused Plaintiff to receive monthly statements after foreclosure."  (Doc. 73, Exh. 5, at #17.)

Getting down to the mechanics of the error, Bayview's internal review showed that the man code for Arnold's loan was changed from an F (meaning foreclosure) to an A (assigning the loan to the asset management department) shortly before the November 25, 2013 foreclosure sale

---

Arnold's.  (Rushia Dep., at 128.)  In Bayview's system, "a loan that is current would receive statements. … [F]oreclosures would not.  Active bankruptcies, would not.  Any customers that asked not to receive statements would not."  (*Id.* at 132.)  The mechanism through which Bayview controls which customers do or do not receive monthly billing statements is the man code, through which the MSP system suppresses issuance of monthly statements to Bayview borrowers whose loans are in foreclosure, for example.

when a Bayview quality assurance employee named Farrah Peterson performed pre-foreclosure review of the loan. (Rushia Dep., at 48-49.)  To complete that review, Peterson went through "a checklist … to make sure that all of the regulatory components and all of the policies and procedures were followed in the foreclosure process." (*Id.* at 49.)[9]  In so doing, she mistakenly "reactivated the loan" in the computer system, "[w]hich was not part of her standard operating procedure." (*Id.*)  That error automatically caused the man code for the Arnold loan to be changed "systematically" in the MSP system from an F to an A.  (*Id.* at 48.)  Bayview acknowledges that "the man code should not have been changed on the Arnolds' loan[] from an F to an A because it … was clearly headed for a foreclosure sale." (*Id.* at 53.)  When a loan is coded "A" in Bayview's system, the MSP system allows monthly billing statements to be issued. (Rushia Decl., ¶ 14.)

The result of the inadvertent recoding of Arnold's loan was that billing statements (which had been suppressed from February 2013 through November 2013 via the correct "F" code) were now allowed, such that statements were sent to Arnold in December 2013 "[d]ue to the error" in the loan coding.  (Rushia Dep., at 60; Rushia Decl., ¶ 19.)  "[H]ad the code not been inadvertently changed on the Arnold loan, the statement would never have been produced." (Rushia Dep., at 55.)  Again, the Arnolds "weren't sent any statements until their code was erroneously changed." (*Id.* at 101.)  Bayview's conclusion, then, is that Arnold "got two

---

[9]      Defendants have placed in the record a copy of the checklist completed by Peterson with respect to Arnold's loan. (Doc. 60, Exh. H.)  That document, styled "Operations Quality Control Analyst Loan Audit – Pre Foreclosure Sale," includes dozens of questions spanning three pages and covering topics such as foreclosure eligibility status, Home Affordable Modification Program ("HAMP") compliance, BLS compliance, contact/workout attempts/solicitation, skip trace attempts, occupancy/inspection, and FCL bid.  The document confirms that Peterson answered each question on the checklist, sometimes adding comments to elaborate on those responses, and concluded, "QC review completed and loan can go to sale 11/25/13.  Borrower has no interest in keeping home. … Loan is tier 2 eligible.  Due for 1/1/12 with a UPB of $244,038.97.  Property is vacant per the insp report." (Doc. 60, Exh. H, at 3.)  Neither party has identified any errors in Peterson's completion of the checklist, or any inaccuracies or misrepresentations in her responses to the questions therein.  Nothing in the exhaustive checklist would instruct or advise a Bayview quality assurance employee to reactivate a loan or adjust its man code in the MSP system during pre-foreclosure review.

statements because of an error that was made by someone doing a pre foreclosure check, that's what happened." (*Id.* at 135.)[10]

### C.    Bayview's Policies and Procedures Regarding FDCPA Compliance.

In relation to its "bona fide error" defense, Bayview has presented substantial, unchallenged evidence regarding its policies and procedures for FDCPA compliance.  For example, Bayview offers a nine-page written policy entitled "FDCPA Policy." (Doc. 58, Exh. K.)  This written FDCPA Policy includes detailed explanations of the Act's requirements and prohibitions, and provides that "[i]t is against [Bayview] policy that an agent, in the process of collecting a debt, use any false, deceptive or misleading representation." (*Id.* at 4.)  The Policy enumerates more than a dozen examples of prohibited "false, deceptive or misleading representations," including "[f]alsely representing the character, amount, or legal status of the debt." (*Id.* at 5.)  The policy also specifically requires that "all [Bayview] personnel receive appropriate training on the Fair Debt Collection Practices Act and the directives of this policy on an annual basis." (*Id.* at 7.)

To implement its written policies, Bayview requires all employees in servicing roles to complete assigned courses regarding FDCPA and other legal obligations on a regular basis. (Rushia Dep., at 14.)  In that regard, Bayview utilizes a 126-page on-line training course for the FDCPA. (Rushia Dep., at 97; doc. 58, Exh. L.)  That training course includes specific directives to Bayview employees that "[d]ebt collectors may not … state any false information, as a way to mislead the consumer in attempting to collect a debt;" and that they may not "[f]alsely stat[e] the status or amount of the debt." (Doc. 58, Exh. L, at 4.)

### IV.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

---

[10]    The reason why Arnold received only two billing statements is that Bayview subsequently changed the man code to an "R" (showing that the loan was being handled by the Real Estate Owned Department) after the foreclosure sale, thereby suppressing billing statements to Arnold once again.  (Doc. 60, Exh. I, at #6; Rushia Decl., ¶ 16.)

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## V.   Analysis.

### A.   *The Bona Fide Error Defense is Properly in the Case.*

Defendant Bayview's sole ground for seeking summary judgment is that Arnold's claims are properly dismissed pursuant to the bona fide error defense. This defense forestalls FDCPA liability where a defendant's violation was unintentional and resulted from a bona fide error notwithstanding defendant's procedures reasonably adapted to avoid such errors. Antecedent to reaching the merits of that defense, the Court examines plaintiff's threshold contention that Bayview failed properly to plead the defense in the Answer. Arnold's position is that the "bona fide error" defense is an affirmative defense subject to heightened pleading requirements that Bayview did not satisfy.

Plaintiff is correct that federal courts have required defendants to plead the FDCPA bona fide error defense with particularity. *See, e.g., Walters v. Performant Recovery, Inc.*, --- F. Supp.3d ----, 2015 WL 4999796, *4 (D. Conn. Aug. 21, 2015) ("[B]ecause the bona fide error defense rests upon mistake, the circumstances surrounding the mistake must be stated with particularity. … [T]o satisfy Rule 9(b), the defense must articulate 'who, what, when, where, and how' the bona fide error occurred.") (citations and internal quotation marks omitted).[11] Plaintiff

---

[11]    *See also Youssofi v. Allied Interstate LLC*, 2016 WL 29625, *3 (S.D. Cal. Jan. 4, 2016) ("District courts have held that the affirmative defense of bona fide error must be stated (Continued)

is also correct that Bayview failed to satisfy the Rule 9(b) particularity requirement in pleading the bona fide error defense.  Indeed, the Answer mentions the defense only in general terms, to-wit:  "Plaintiff's individual and class claims are barred by the bona fide error defense pursuant to the FDCPA, 15 U.S.C. § 1692, *et seq.*"  (Doc. 10, at 13.)

Notwithstanding Arnold's identification of this pleading deficiency, plaintiff's argument fails because it comes too late.  Defendants filed their Answer – including the bona fide error defense – back on January 9, 2015.  (*See* doc. 10.)  Plaintiff never challenged the sufficiency of that defense, much less moved to strike it, until filing his summary judgment response on November 23, 2015.  (*See* doc. 73.)  The Federal Rules of Civil Procedure do not allow plaintiffs to sit on technical objections to the manner in which an affirmative defense is pleaded for more than ten months until a strategically advantageous moment.  If Arnold wished to challenge the sufficiency of defendants' pleading of the bona fide error defense, his remedy was to file a motion to strike within 21 days after service of the Answer.  *See* Rule 12(f)(2), Fed.R.Civ.P. ("The court may strike from a pleading an insufficient defense … on motion made by any party … within 21 days after being served with the pleading.").  He did not do so.  The upshot is that plaintiff cannot raise this technical pleading defect for the first time on summary judgment as a means of derailing the Rule 56 Motion and excising that defense from the case.[12]

To be sure, the Court appreciates that district courts have discretion to relax the Rule 12(f)(2) deadline and grant a meritorious motion to strike insufficient defenses from a pleading, even if the motion is untimely.  Here, however, such a course of action is unwarranted.  To strike Bayview's bona fide error defense now on purely technical pleading grounds would be unjust.

---

with particularity under Rule 9(b)."); *Wiebe v. Zakheim & Lavrar, P.A.*, 2012 WL 5382181, *2 (M.D. Fla. Nov. 1, 2012) ("A claim of bona fide error is tantamount to a claim of mistake and therefore, the Defendant must plead this defense with the particularity required by Rule 9(b).").

[12]     *See, e.g., Action Nissan, Inc. v. Hyundai Motor America*, 617 F. Supp.2d 1177, 1187 (M.D. Fla. 2008) (rejecting plaintiff's request on summary judgment to strike affirmative defense, where plaintiff raised issue 15 months after answer was filed); *Cowart v. City of Eau Claire*, 571 F. Supp.2d 1005, 1008 (W.D. Wis. 2008) ("Defendants filed their amended answer on January 7, 2008; plaintiffs filed the motion to strike on April 9, 2008.  Therefore, it will be denied as untimely."); *Blanc v. Safetouch, Inc.*, 2008 WL 4059786, *1 (M.D. Fla. Aug. 27, 2008) (opining that, where plaintiff moved to strike affirmative defense 84 days after answer was filed, "Plaintiffs' Motion to Strike is untimely and can be denied on that basis alone").

Bayview would be blindsided if it were stripped of a key affirmative defense because of a mere pleading error that it could have readily corrected long ago had Arnold raised the issue then. More importantly, Arnold will not be prejudiced by the continued inclusion of the bona fide error defense in this litigation.  As noted, Arnold has been on notice of that defense for a year, and had a full opportunity to explore the who/what/when/where/how details of that defense during discovery.  In that regard, Bayview furnished plaintiff with specific facts undergirding the bona fide error defense in interrogatory responses served on June 30, 2015.  (*See* doc. 60, Exh. I, at #6.)  Plaintiff's counsel interrogated Bayview's corporate representative extensively concerning the facts supporting the bona fide error defense in a Rule 30(b)(6) deposition conducted on August 14, 2015.  (*See* Rushia Dep., at 46-49, 53, 55, 60, 101, 135.)  Under the circumstances, plaintiff's conclusory protestation that he "was deprived of an opportunity to address in discovery any specific bona fide error Bayview claimed qualified as an FDCPA defense" (doc. 73, at 8) is irreconcilable with the record.  The information before the undersigned shows that defendants disclosed to plaintiff during discovery all facts on which their bona fide error defense rests.

The bottom line is this:  Plaintiff could have moved to strike the bona fide error defense from the Answer pursuant to Rule 12(f)(2) back in January 2015.  He chose not to do so, instead waiting until the summary judgment stage to request that the defense must be stricken as inadequately pleaded.  To grant plaintiff's request now would impose a harsh, unfair sanction on Bayview, which could have corrected its pleading defect a year ago had plaintiff objected then.[13] By contrast, to deny plaintiff's request at this time would work no unfair prejudice on Arnold, given that he (i) was on notice of the defense, and (ii) received all of defendant's information relevant to that defense and explored that issue at length in Bayview's Rule 30(b)(6) deposition during the discovery process.  For these reasons, plaintiff's objection to Bayview's bona fide error defense on timeliness grounds is **overruled**.

---

[13]     *See generally Wiebe*, 2012 WL 5382181, at *2 ("While affirmative defenses are subject to being stricken if they are legally insufficient, striking a defense is a drastic remedy which is disfavored by the courts.") (citations and internal quotation marks omitted).

B.      *Parameters of FDCPA Bona Fide Error Defense.*

"[T]he FDCPA affords a narrow carve-out to the general rule of strict liability, known as the 'bona fide error' defense." *Owen v. I.C. System, Inc.*, 629 F.3d 1263, 1271 (11ᵗʰ Cir. 2011). By its terms, the Act provides that "[a] debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). As construed by the courts, this defense is unavailable for mistakes of law or misinterpretations of the FDCPA's requirements, but instead is designed to "protect[] against liability for errors like clerical or factual mistakes." *Prescott v. Seterus, Inc.*, --- Fed.Appx. ----, 2015 WL 7769235, *5 (11ᵗʰ Cir. Dec. 3, 2015) (citation and internal quotation marks omitted).  In this way, the "bona fide error" defense "insulates [debt collectors] from liability even when they have failed to comply with the Act's requirements." *Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1352 (11ᵗʰ Cir. 2009).

To prevail on this defense, "a debt collector bears a three-part burden of showing that its FDCPA violation (1) was not intentional; (2) was a bona fide error; and (3) occurred despite the maintenance of procedures reasonably adapted to avoid any such error." *Owen*, 629 F.3d at 1271 (citation and internal quotation marks omitted); *see also Isaac v. RMB Inc.*, 604 Fed.Appx. 818, 820 (11ᵗʰ Cir. Mar. 17, 2015) ("To assert the bona fide error defense, a debt collector must prove by a preponderance of evidence that its violation of the FDCPA was unintentional and was the result of a bona fide error, despite procedures reasonably adapted to avoid errors.").  "The failure to meet any one of those three requirements is fatal to the defense." *Edwards*, 584 F.3d at 1353.

C.      *Adequacy of Bayview's Proof of Bona Fide Error Defense.*

As discussed *supra*, the purportedly unlawful conduct for which plaintiff brings FDCPA claims against Bayview consists of the Monthly Billing Statements sent to Arnold on December 2, 2013 and December 16, 2013.  Again, plaintiff contends that such correspondence was violative of FDCPA because the bills related to debt that had been discharged in bankruptcy, inflated the debt by failing to credit amounts paid at the November 2013 foreclosure sale, and constituted harassment.  Simply put, Arnold's FDCPA claim is that Bayview's issuance of the December 2 and December 16 billing statements violated the Act.  It is to that theory of liability that Bayview's bona fide error defense is properly applied.

-14-

The first prong of the defense is that Bayview must show that its purported FDCPA violation (*i.e.*, sending the December 2 and December 16 billing statements to Arnold) was unintentional.  This element requires a showing "that the violation was unintentional, not that the underlying act itself was unintentional," such that Bayview must "establish the lack of specific intent to violate the Act."  *Johnson v. Riddle*, 443 F.3d 723, 728 (10th Cir. 2006).[14]  "In other words, the intent prong of the bona fide error defense is a subjective test."  *Id.*  Here, Bayview has readily shown that any violation of the FDCPA with regard to the mailing of the December 2013 billing statements was unintentional because (i) Arnold's loan had been coded with a foreclosure man code when Bayview assumed servicing responsibilities, effectively suppressing all billing statements; (ii) Bayview sent no billing statements to Arnold between February 2013 and November 2013; (iii) the Bayview employee who performed a pre-foreclosure review of Arnold's loan was bound to follow a Bayview checklist that did <u>not</u> call for changing the man code or issuing billing statements; (iv) nothing in the checklist or employee comments suggested that this individual intended to change the man code or reactivate Arnold's loan; (v) the man code was changed anyway, even though Bayview had no reason to do so in its pre-foreclosure review; (vi) Bayview ceased communications to Arnold when it discovered the error; and (vii) Bayview provides extensive, ongoing training to employees in the area of FDCPA compliance. Viewing these facts through the inferential, subjective lens ascribed to the intent prong, the Court concludes that no reasonable finder of fact could disagree that Bayview's alleged error was unintentional.  Defendant has conclusively shown that Bayview never meant to send FDCPA-noncompliant bills to Arnold while his loan was in foreclosure.

Second, Bayview must establish that the transmission of the December 2013 billing statements to Arnold was a bona fide error.  "A bona fide error is a mistake that occurred in good faith."  *Isaac*, 604 Fed.Appx. at 820; *see also Edwards*, 584 F.3d at 1353 ("As used in the Act 'bona fide' means that the error resulting in a violation was made in good faith; a genuine mistake, as opposed to a contrived mistake.") (citations and internal quotation marks omitted);

---

[14]     *See also Rush v. Portfolio Recovery Associates LLC*, 977 F. Supp.2d 414, 427 n.14 (D.N.J. 2013) (noting that courts "focus their intent inquiry on whether the debt collector intended to violate the FDCPA"); *Rose v. Roach*, 2013 WL 1563655, *4 (W.D. Va. Apr. 12, 2013) ("Regarding the first prong, the bona fide error defense requires only the negation of specific intent to violate the FDCPA").

*Goodin v. Bank of America, N.A.*, --- F. Supp.3d ----, 2015 WL 3866872, *8 (M.D. Fla. June 23, 2015) ("An error is bona fide only where it was made in good faith and was objectively reasonable."). This element of the defense "serves to impose an objective standard of reasonableness upon the asserted unintentional violation." *Johnson*, 443 F.3d at 729 (citations omitted). All record information before the Court reflects that it was objectively reasonable for Bayview to rely on the foreclosure man code to suppress monthly statements to Arnold; that Bayview had no reason to believe that the man code would be changed during the pre-foreclosure review process; and that it had provided appropriate training and checklists to its employees concerning pre-foreclosure review. All of these facts considered together support a compelling inference that Bayview's mistake in issuing the December 2013 billing statements to Arnold was made in good faith and was objectively reasonable (*i.e.*, not a contrived mistake).

Third, "to qualify for the bona fide error defense, the debt collector has an affirmative statutory obligation to maintain procedures reasonably adapted to avoid readily discoverable errors." *Owen*, 629 F.3d at 1276-77. This "procedures" prong of the defense "involves a two-step inquiry. … The first step is whether the debt collector 'maintained' – *i.e.*, actually employed or implemented – procedures to avoid errors. … The second step is whether the procedures were reasonably adapted to avoid the specific error at issue." *Id.* at 1274 (citations and internal quotation marks omitted). "In other words, the errors must have occurred despite regular processes that are mechanical or otherwise orderly in nature." *Goodin*, 2015 WL 3866872, at *8. The Supreme Court has explained that "the relevant procedures are ones that help to avoid errors like clerical or factual mistakes." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 587, 130 S.Ct. 1605, 176 L.Ed.2d 519 (2010). This is a "fact-intensive inquiry" that proceeds "on a case-by-case basis and depend[s] upon the particular facts and circumstances of each case." *Owen*, 629 F.3d at 1274; *see also Gibbs v. Palm Beach Credit Adjustors, Inc.*, 2015 WL 4698427, *2 (S.D. Fla. Aug. 6, 2015) ("Whether a defendant's procedures support a bona fide error defense is fact-intensive, two-step inquiry.").

To satisfy its burden as to the "procedures" element, Bayview points to both its general training procedures and its specific procedures for pre-foreclosure review. As to the former, Bayview's evidence is that it has promulgated written policies and administers substantial ongoing training to employees regarding FDCPA compliance, including prohibitions on false, deceptive or misleading representations, such as falsely stating the character, amount or legal

status of the debt.  As to the latter, Bayview shows that it utilizes a detailed multipage checklist styled "Operations Quality Control Analyst Loan Audit – Pre Foreclosure Sale" (Doc. 60, Exh. H) to guide the actions of quality assurance employees like Farrah Peterson, who performed the fateful pre-foreclosure review of Arnold's loan.  Nothing in that checklist (which spans dozens of specific items) would call for, prompt, instruct or induce a Bayview employee performing pre-foreclosure review to reactivate the loan in a manner that would alter the man code and trigger monthly statements.  The Court agrees with Bayview that this evidence, taken in the aggregate, adequately reflects that Bayview has mechanical, orderly processes in place to avoid errors, and that those procedures were reasonably adapted to avoid the specific error that occurred here (*i.e.*, the reactivation of a borrower's loan on pre-foreclosure review, thereby changing the man code on the loan and erroneously ending suppression of monthly billing statements).  It appears uncontroverted and uncontroversial that, had employee Peterson simply followed the checklist and abided by her FDCPA training, she would not have reactivated the Arnold loan.  Absent such reactivation, of course, the loan's man code never would have been changed from an F to an A, and Arnold would not have received billing statements in December 2013.  Thus, all evidence before the Court confirms that Bayview has satisfied the "procedures" prong of the bona fide error defense.

> ### D.    *Arnold's Stance on the Merits of the Bona Fide Error Defense.*

Faced with this evidence and argument in support of Bayview's bona fide error defense, plaintiff does not challenge defendant's reasoning or conclusion head-on.  He does not suggest that Bayview's reactivation of Arnold's loan during pre-foreclosure review and ensuing issuance of two billing statements was an intentional violation of the FDCPA.[15]  He does not present evidence or argument that Peterson's reactivation of the loan and the resulting automatic change to the man code for Arnold's loan was anything but a genuine mistake made in good faith.  And he does not dispute Bayview's showing that it maintained mechanical procedures reasonably

---

[15]     Walking the narrative back one step further, plaintiff also does not quarrel with Bayview's explanation of how it came to be that inaccurate monthly billing statements were sent to Arnold in December 2013.  In other words, plaintiff expresses no disagreement with, and presents no evidence contradicting, Bayview's investigative determinations as to the chain of events causing the purportedly violative billing statements to be mailed to Arnold.  Plaintiff offers no other theories, competing explanations or contrary evidence with respect to the genesis of the offending billing statements.

adapted to prevent the error that occurred here (again, Peterson's reactivation of the loan on pre-foreclosure review, resulting in inadvertent change of the man code to end suppression of monthly billing statements) from taking place.

Rather than rebutting Bayview's formulation of the bona fide error defense as it applies to this specific error, plaintiff's analysis adopts a vastly different trajectory. In particular, plaintiff rails against Bayview for not taking sufficient steps to avoid attempting to collect debts discharged in bankruptcy generally. Plaintiff insists that "Bayview has **no** procedure to prevent it from attempting collection of discharged debts because it intentionally sends bills and statements to borrowers who have received a discharge." (Doc. 73, at 9.) Plaintiff asserts that "there is no doubt that Bayview intentionally bills consumers with discharged debts by default." (*Id.* at 10.)[16] According to plaintiff, "[b]ecause Bayview has no procedure to avoid billing consumers whose debts are discharged its BFE defense fails." (*Id.* at 12.) Plaintiff also maintains that the pre-foreclosure review checklist is inadequate because it is not "maintained to avoid the attempted collection of discharged debt." (*Id.* at 14.) In plaintiff's view, Bayview's general practice of sending billing statements to borrowers whose debts were discharged in bankruptcy, except where the borrower objects, precludes assertion of the "bona fide error" defense here because it shows that Bayview's violations were intentional, not made in good faith, and not subject to reasonable procedures to avoid such errors.

The fundamental problem with plaintiff's analysis is that it is not tailored to the specific error that forms the basis of Arnold's FDCPA claims against Bayview. Case law is clear, and the parties themselves acknowledge, that the bona fide error defense must be examined as to "the specific error at issue." *Owen*, 629 F.3d at 1276-77. The "specific error at issue" in this case is the inadvertent reactivation of Arnold's loan by a Bayview employee performing pre-foreclosure review. This specific error changed the man code associated with Arnold's loan and resulted in two billing statements being sent to Arnold in December 2013. Those two bills form the entire

---

[16]     Record evidence supports plaintiff's characterization of Bayview's practices. The following exchange from Bayview's Rule 30(b)(6) deposition is illustrative:

"Q:     Is it Bayview's policy to continue to send statements to the borrowers who have received a discharge?
"A:     If the borrower has not objected to receiving the statement."

(Rushia Dep., at 128-29.)

Case 1:14-cv-00543-WS-C   Document 81   Filed 01/29/16   Page 19 of 23

factual predicate of Arnold's FDCPA cause of action.[17]  If Bayview did not intentionally send violative billing statements to Arnold in December 2013, if the reactivation of the loan and changing of the man code were genuine mistakes made in good faith, and if Bayview maintained procedures reasonably adapted to avoid such inadvertent reactivation and recoding of loans during pre-foreclosure review, then the bona fide error defense applies here, irrespective of other errors that Bayview may have made with respect to Arnold, or to borrowers with discharged debts generally.  Bayview has shown that all of these conditions are satisfied with regard to the specific error at issue; therefore, the defense applies.

Stated differently, plaintiff's fixation on Bayview's purported practice of billing borrowers whose debts have been discharged is unavailing because that general practice was not the specific error that caused Arnold to receive billing statements.  It is undisputed that, during the first ten months that Bayview serviced the loan, Bayview never sent a single monthly billing statement to Arnold.  This is so, even though Arnold's debt had been discharged in bankruptcy well before Bayview began servicing his loan.  Because Bayview successfully suppressed billing statements to Arnold for that ten-month span, we know that the specific error here was not Bayview's purported general practice of billing customers whose debts had been discharged. Regardless of what Bayview's general practices were, Arnold's loan was coded properly, and statements were correctly suppressed, from February 1, 2013 through December 1, 2013.  What changed in December?  Certainly not Bayview's general policies and practices concerning discharged debts.  No evidence to that effect has been presented.  What changed was that a single Bayview employee made a single processing error that changed the code on Arnold's loan,

---

[17]      In response to Bayview's bona fide error defense, plaintiff points to "undisputed" facts that Bayview "committed numerous FDCPA violations" with regard to the Arnold loan, such as contacting Arnold while he was represented by counsel, fraudulently billing him for force-placed insurance, and failing to cease communications.  (Doc. 73, at 12-13.)  But plaintiff admits that these purported transgressions "were outside of the one year limitations period when the complaint was filed."  (*Id.* at 13.)  Accordingly, they are not part of Arnold's FDCPA claims against Bayview, and they do not constitute the "specific error at issue" for purposes of the bona fide error defense.  Whether Bayview could invoke the bona fide error defense against claims that it contacted Arnold directly after he was represented by counsel, for example, is simply not the question presented here because no FDCPA cause of action predicated on such a violation is presented in the First Amended Complaint.  Again, the bona fide error defense must be analyzed in terms of the specific error at issue, *i.e.*, the issuance of the December 2013 billing statements, and nothing more.

-19-

effectively ending the suppression of billing statements and allowing the December 2 and December 16 statements to go out.  That is the "specific error" on which the bona fide error defense analysis appropriately centers.  And that specific error had nothing whatsoever to do with Bayview's general practices concerning borrowers whose debts have been discharged.[18] Plaintiff's argument to the contrary would disregard undisputed record facts, would transform this action into something it is not, and would misapply the legal principles used in adjudicating the bona fide error defense.

In light of the foregoing, the Court finds that Bayview has met its burden of establishing entitlement to the bona fide error defense for Arnold's FDCPA claims.  No genuine issues of fact appearing in the record, Bayview is entitled to judgment in its favor on that affirmative defense as a matter of law.  Accordingly, the Motion for Summary Judgment will be **granted** as to Arnold's claims against defendant Bayview.

### E.  *Defendant's Motion Pertaining to U.S. Bank as Trustee.*

In contrast to the parties' hard-fought briefing as to whether Bayview is entitled to summary judgment, there appears to be no dissent that U.S. Bank is entitled to dismissal of

---

[18]     Perhaps plaintiff is suggesting that Bayview could have done something more to make sure that Arnold did not get billed, such as instituting an across-the-board prohibition on sending billing statements to borrowers with discharged debts.  That argument might have superficial allure.  After all, if Bayview had imposed a blanket ban on statements to customers with discharged debts, such a policy would have blocked the December 2013 statements, notwithstanding the reactivation error during the pre-foreclosure review process.  But the bona fide error defense does not require a defendant to exhaust all possible means of preventing the specific error.  Again, the legal standard is that the defendant "maintain procedures reasonably adapted to avoid readily discoverable errors."  *Owen*, 629 F.3d at 1276-77.  Bayview was not obliged to do everything imaginable to prevent Arnold from being billed.  *See, e.g., Kort v. Diversified Collection Services, Inc.*, 394 F.3d 530, 539 (7th Cir. 2005) (even though defendant "could have done more," FDCPA "does not require debt collectors to take every conceivable precaution to avoid errors; rather, it only requires reasonable precaution"); *Cerrato v. Solomon & Solomon*, 909 F. Supp.2d 139, 148 (D. Conn. 2012) ("When attempting to show that he is entitled to the bona fide error defense, a debt collector need not demonstrate that his procedures for avoiding FDCPA violations are fool proof, but rather, must only show that its procedures constitute a reasonable precaution.") (citations and internal marks omitted); *Tucker v. CBE Group, Inc.*, 710 F. Supp.2d 1301, 1306 n.5 (M.D. Fla. 2010) ("The bona fide error defense is used when the Defendant demonstrates that reasonable procedures are in place to prevent errors; the procedures need not be foolproof.").  And the Court has expressly found that Bayview procedures were reasonably adapted to prevent this error from occurring in circumstances like Arnold's.  Nothing more was required, even if something more was possible.

Arnold's claims.  Indeed, plaintiff has expressly conceded that "it appears that the Trust is entitled to summary judgment."  (Doc. 73, at 19.)

As a matter of black-letter law, plaintiff's FDCPA claims against U.S. Bank are not viable unless U.S. Bank qualifies as a debt collector within the meaning of the Act.  *See, e.g., Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1313 (11th Cir. 2015) ("There is no dispute that § 1692e applies only to debt collectors.").[19]  Unsurprisingly, "[a] 'debt collector' is a term of art in the FDCPA."  *Ausar-El ex rel. Small, Jr. v. BAC (Bank of America) Home Loans Servicing LP*, 448 Fed.Appx. 1, 2 (11th Cir. Sept. 21, 2011).  Subject to certain enumerated exclusions, the Act defines the term "debt collector" to mean "[1] any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or [2] who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  With regard to the second prong, the Eleventh Circuit has clarified that "our inquiry under § 1692a(6) is not whether [defendant] regularly collects on debts *originally* owed or due another and now owed to [defendant]; our inquiry is whether [defendant] regularly collects on debts owed or due another at the time of collection."  *Davidson*, 797 F.3d at 1318.

This brings us to the fatal flaw with Arnold's claims against U.S. Bank.  There is no evidence that U.S. Bank, as trustee for the real estate investment trust that acquired Arnold's loan in July 2013, is engaged in any business whose principal purpose is the collection of debts.  It is self-evident, after all, that the "principal purpose" of an investment trust's business is to earn financial returns on investments.  Besides, defendant's uncontested evidence establishes that "U.S. Bank does not engage in debt collection or servicing of any loans contained in the Trust," and that "[t]he Trust does not engage in debt collection or servicing of any loans contained in the Trust."  (Rushia Decl., ¶¶ 5-6.)  So U.S. Bank cannot be a debt collector within the meaning of the first prong of § 1692a(6).  Nor can Arnold hold U.S. Bank liable as a debt collector under the

---

[19]        *See also Milijkovic v. Shafritz and Dinkin, P.A.*, 791 F.3d 1291, 1297 (11th Cir. 2015) ("The FDCPA regulates what debt collectors can do in collecting debts."); *Harris v. Liberty Community Management, Inc.*, 702 F.3d 1298, 1302 (11th Cir. 2012) (observing that "[t]he Act's restrictions apply only to debt collectors," as defined in the statute); *White v. Bank of America Bank, NA*, 597 Fed.Appx. 1015, 1020 (11th Cir. Dec. 29, 2014) ("The FDCPA imposes civil liability on 'debt collectors' for certain prohibited debt-collection practices.").

second definition in § 1692a(6) because a key aspect of that formulation is that the entity must regularly collect debts "owed or due another."  U.S. Bank was the owner of Arnold's loan and all the other loans contained within the Trust; therefore, even if U.S. Bank did engage in activities to collect on those debts, it would not fall within the definition of "debt collector" because those debts were not "owed or due another at the time of collection."  *Davidson*, 797 F.3d at 1318.[20]

As noted, plaintiff prudently capitulates in his response brief by acknowledging that, based on *Davidson*, U.S. Bank is entitled to summary judgment.  Accordingly, and in light of the foregoing principles unambiguously establishing that U.S. Bank is not a "debt collector" within the meaning of § 1692a(6) and therefore cannot incur FDCPA liability for the Arnold loan, the Motion for Summary Judgment is **granted** as to defendant U.S. Bank, and all claims against that defendant will be **dismissed**.  Simply put, U.S. Bank (as trustee for the Trust) was not engaged in a business whose principal purpose was debt collection, and did not regularly collect on debts owed or due another at the time of collection.  Therefore, Arnold's claims against the U.S. Bank / Trust defendant are not sustainable, as a matter of law.

## VI.    Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.    Defendants' Motion to Seal (doc. 58) is **granted**.  Exhibits G, J, K and L to defendants' Motion for Summary Judgment (*see* docs. 58-1, 58-2, 58-3 & 58-4) are to remain **sealed**.  The Clerk's Office is directed to **unseal** defendants' Motion to Seal (doc. 58), but not the appended exhibits;

---

[20]    In his First Amended Complaint, Arnold attempted to cast U.S. Bank as a debt collector under both § 1692a(6) definitions.  First, Arnold alleged that "[t]he sole purpose of the Trust is the purchase of defaulted mortgage loans, at deeply discounted prices, and the collection [of] those loans."  (Doc. 66, ¶ 10.)  However, plaintiff has identified no evidence to support such a claim, and defendants' uncontroverted evidence is that the principal purpose of U.S. Bank's business could not be collection of defaulted mortgage loans because U.S. Bank does not engage in collection of any loans within the Trust.  Second, Arnold pleaded that "[t]he Trust is also a debt collector because it obtained the Plaintiff's loan after it was in default for the purpose of collection" (doc. 66, ¶ 13), thereby suggesting that this debt was at some time "owed or due another."  However, *Davidson* conclusively forecloses that pathway to FDCPA debt collector status.  *See Davidson*, 797 F.3d at 1316 ("[A]pplying the plain language of the statute, we find that a person who does not otherwise meet the requirements of § 1692(a)(6) is not a 'debt collector' under the FDCPA, even where the consumer's debt was in default at the time the person acquired it.").

2.      Defendants' redundant Motion to Seal (doc. 57) is **moot**;

3.      Plaintiff's Motion for Leave to File Sur-Reply (doc. 76) is **granted** and the
        proposed Sur-Reply (doc. 76-1) appended to same has been considered herein
        (along with Defendants' Memorandum in Opposition (doc. 80)) insofar as it may
        be relevant;

4.      Defendants' Motion for Summary Judgment (doc. 59) is **granted**, and plaintiff's
        claims against all defendants are **dismissed with prejudice**;

5.      In light of these rulings, the Motion for Class Certification (doc. 56) under Rule
        23, Fed.R.Civ.P., and various related Motions relating to same (docs. 61, 70) are
        **moot**; and

6.      A separate judgment will enter.


DONE and ORDERED this 29th day of January, 2016.


                                        s/ WILLIAM H. STEELE
                                        CHIEF UNITED STATES DISTRICT JUDGE